FILED

06/21/2017

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### April 11, 2017 Session

## JOHN F. PINKARD, M.D. v. HCA HEALTH SERVICES OF TENNESSEE, INC. D/B/A SUMMIT MEDICAL CENTER

### Appeal from the Circuit Court for Davidson County
### No. 08C1708      Joseph P. Binkley, Jr., Judge

### No. M2016-01846-COA-R9-CV

We granted this interlocutory appeal to determine whether Tenn. Code Ann. § 68-11-272(c)(1) of the Healthcare Quality Improvement Act ("HCQIA"), as applied to the facts of this case, violates the separation of powers provisions in the Tennessee Constitution. Plaintiff, a physician whose medical staff privileges were terminated by Summit Medical Center, sued the hospital, alleging, *inter alia*, that it acted in bad faith and with malice during the peer review process. Following a lengthy discovery process, the hospital filed a motion for summary judgment asserting, *inter alia*, that Plaintiff's anticipated evidence was confidential, privileged, and inadmissible under the HCQIA because it was derived from the activity of a Quality Improvement Committee ("QIC"). At the same time, the hospital filed a motion in limine to exclude all records of quality improvement activity pursuant to the evidentiary privilege under Tenn. Code Ann. § 68-11-272(c)(1). After ascertaining that Plaintiff intended to rely on QIC evidence, the trial court ruled that the peer review privilege could not be waived, and that Tenn. Code Ann. § 68-11-272(c)(1) violated the separation of powers provisions because it deprived the court of its inherent authority to make evidentiary decisions affecting "the heart of this case." This Tenn. R. App. P. Rule 9 interlocutory appeal followed. We agree with the trial court's ruling that the privilege cannot be waived. However, we disagree with the trial court's ruling that Tenn. Code Ann. § 68-11-272(c)(1), as applied to the facts of this case, violates the separation of powers provisions in the Tennessee Constitution. This is because the General Assembly created the evidentiary privilege to effectuate one of its powers, the enactment of legislation that promotes the safety and welfare of our citizens. To that end, the primary concern of the challenged legislation is not to create court rules, but to promote candor within a hospital's quality improvement process to ensure effective evaluation measures. Furthermore, Tenn. Code Ann. § 68-11-272(c)(2) provides an "original source" exception to the privilege whereby documents not produced specifically for use by a QIC, and are otherwise available from original sources, are both discoverable and admissible into evidence even if the information was presented during a QIC proceeding. Thus, the privilege is reasonable and workable within the framework of

evidentiary rules already recognized by the judiciary. For these reasons, we reverse and remand for further proceedings.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Reversed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Dixie W. Cooper and Kaycee L. Weeter, Nashville, Tennessee, for the appellant, HCA Health Services of Tennessee, Inc. d/b/a Summit Medical Center.

Herbert H. Slatery III, Attorney General and Reporter; Joseph F. Whalen, Associate Solicitor General; and Stephanie A. Bergmeyer, Assistant Attorney General, Nashville, Tennessee, for the intervenor-appellant, the State of Tennessee.

C. Bennett Harrison, Jr., Sean C. Wlodarczyk, and John D. Kitch, Nashville, Tennessee, for the appellee, John F. Pinkard, M.D.

**OPINION**

The plaintiff, John Pinkard, M.D. ("Dr. Pinkard") held medical staff privileges at HCA Health Services of Tennessee, Inc., d/b/a Summit Medical Center ("Summit") from 1999 to 2006. On November 21, 2006, the Chief of the Medical Staff and the Chief of the Department of Surgery summarily suspended Dr. Pinkard's medical staff privileges because of patient safety concerns. After conducting an investigation, the hospital's Medical Executive Committee ("MEC") upheld the suspension and terminated Dr. Pinkard's privileges.

On May 30, 2008, Dr. Pinkard commenced this action against Summit alleging, in pertinent part, that Summit acted in bad faith and with malice during the peer review process that concluded with the termination of his hospital privileges. Summit timely filed its answer denying it breached any duty and denying it acted in bad faith or with malice. We summarize the relevant facts and proceedings leading to the initiation of this appeal below.

Dr. Pinkard is a board-certified thoracic surgeon. He gained the privilege to practice thoracic and vascular surgery at Summit in 1999, and by 2001, he practiced almost exclusively at Summit. Summit contends that in 2002, Dr. Pinkard's relationship with the nursing staff became contentious, and the staff's morale declined. These "behavioral issues" culminated in 2003 when Dr. Pinkard confronted an emergency room physician about that physician's medical treatment of a patient. Summit claimed that Dr. Pinkard was "verbally abusive and personally degrading," and that the "incident disrupted the flow of patient care." Dr. Pinkard alleged that the physician incompetently

performed a procedure on the patient, causing a harmful complication. This incident led to an agreement between Dr. Pinkard and Summit that any further complaints about Dr. Pinkard's behavior would go to arbitration. In May 2006, Summit received two complaints about Dr. Pinkard's disruptive behavior with the nursing staff. The hospital set arbitration concerning one of those complaints for January 2007.

In October 2006, Dr. Pinkard received a letter from a physician at Summit relaying the recent findings of Summit's peer review committee. The letter stated that, after a review of Dr. Pinkard's performance at the hospital, the committee found that his complication and mortality rates were consistently below the expected rates for vascular surgeons. However, a month later, Summit's view of Dr. Pinkard's competency as a vascular surgeon changed following a surgery he performed on a patient known as J.E.F. for confidentiality purposes. J.E.F. suffered significant blood loss during the operation, and Dr. Pinkard and Summit vehemently disagreed as to the cause of that complication. Despite the patient's blood loss, the patient not only survived the operation but made a full recovery.

An anesthesiologist present during the surgery claimed that Dr. Pinkard improperly pulled a filter from the patient's vena cava which caused the patient to hemorrhage. Dr. Pinkard argued that the anesthesiologist did not have the necessary vantage point during the surgery to make that determination. To the contrary, Dr. Pinkard claimed that the patient's blood loss resulted from an aorto-caval fistula, a rare structural abnormality in which the aorta adheres to the vena cava. Summit suspended Dr. Pinkard's privileges in accordance with its bylaws, and the MEC conducted an investigation. After reviewing the patient's medical record and radiological reports, the MEC upheld the suspension and voted to revoke Dr. Pinkard's privileges. It determined that a pre-operative angiogram did not reveal the presence of an aorto-caval fistula as Dr. Pinkard reported in the patient's medical record. Thus, the MEC found that Dr. Pinkard falsified that record. Shortly thereafter, Dr. Pinkard expressed his desire to appeal the committee's decision, and Summit scheduled a fair hearing.

Prior to the fair hearing, Dr. Pinkard and his attorney requested access to the system Summit used to store J.E.F.'s CT scan along with a special projector to display the image for the fair hearing panel. Dr. Pinkard intended to use it to support his contention that J.E.F. had an aorto-caval fistula. However, hospital employees informed him that he could not have access to the projector because he was no longer a member of the medical staff. Summit argued that Dr. Pinkard could have presented an image of the CT scan as maintained on a CD-ROM or plain filed film. However, Summit's own expert witness, a physician and chair of Vanderbilt Vascular, testified before the fair hearing panel that the multiple-layered CT scan angiogram was the best way to ascertain the presence of a pre-operative aorto-caval fistula, not plain film or CD-ROM images. Thus, Dr. Pinkard argued that this evidence was crucial to his case, and the fact that Summit would not allow him to present it to the fair hearing panel strongly suggested bad faith on

Summit's part. Though the fair hearing panel agreed to review the CT scan angiogram during its deliberations, there was no evidence that it did so.

Dr. Pinkard explained that not only did Summit place him at a disadvantage regarding J.E.F.'s surgery, the hospital also used the hearing to rehash past behavioral issues that had already been resolved. Moreover, it selected and addressed eight of the over 1,000 surgeries Dr. Pinkard performed at the hospital, each of which had been subjected to peer review without adverse consequences. Dr. Pinkard argued that Summit never notified him that the panel would be considering the past behavioral issues or the other eight surgeries, and thus, he felt ill-prepared to defend himself. Dr. Pinkard contended these actions further demonstrated malice in the peer review process.

After reviewing the evidence, the fair hearing panel agreed with the MEC, but it decided to make an alternative recommendation that the MEC revoke only Dr. Pinkard's vascular surgical privileges and reinstate his general thoracic surgical privileges. Despite this recommendation, the MEC decided unanimously to revoke all of Dr. Pinkard's hospital privileges.

Dr. Pinkard alleged that Summit issued its revocation purely for financial reasons and not in the interest of patient safety. He explained that in 2005, another vascular surgeon entered into a contract with Summit. The contract between Summit and this new surgeon stipulated that the hospital would advance the new physician's income for one year with a payback of that income beginning in August 2006. At the time of Summit's initial decision to suspend Dr. Pinkard's privileges, this new physician was entering the payback phase of his agreement with Summit. Since Dr. Pinkard and this physician were the only vascular surgeons practicing at Summit, this physician's practice increased when Dr. Pinkard left. Thus, it allowed the new vascular surgeon to pay back the money Summit advanced him.

After exhausting his appeals within Summit's peer review process, Dr. Pinkard commenced this action alleging, *inter alia*, that Summit conducted its peer review in bad faith and with malice. After filing its answer, Summit filed its first motion for summary judgment relying, in part, on the Tennessee Peer Review Law ("TPRL"), Tenn. Code Ann. § 63-6-219, which was in effect when Dr. Pinkard commenced this action. Summit argued that the TPRL afforded it immunity from a claim for damages if it acted in good faith and without malice throughout the peer review process. It also noted that the TPRL created a presumption that it acted in good faith and without malice, and that Dr. Pinkard had no evidence to overcome the presumption. Summit supported its motion by attaching a redacted version of the fair hearing transcript along with numerous other exhibits from the fair hearing. Dr. Pinkard responded in opposition with several affidavits and deposition testimony.

The trial court denied Summit's motion, outlining three main facts that, if presented to a jury, could lead the jury to conclude that Summit conducted its peer review in bad faith and with malice. First, the court found that a jury could infer malice from the fact that Summit denied Dr. Pinkard access to the system which stored the CT scan angiogram of J.E.F. and also denied him access to a projector to show that image to the fair hearing panel. The trial court found the CT scan to be a "crucial" piece of evidence, and it further noted that the record of the fair hearing panel did not show that it actually viewed the CT scan angiogram slides in its deliberations. Second, the court agreed with Dr. Pinkard that a reasonable jury could infer malice from Summit's introduction of eight "stale" surgical cases and previously resolved behavioral issues. Third, the court found that a reasonable jury could infer malice from the MEC's refusal to consider the fair hearing panel's secondary recommendation, since the fair hearing panel heard more evidence and conducted a more thorough investigation than the MEC.

Effective April 12, 2011, the legislature repealed and replaced the TPRL with the enactment of Tenn. Code Ann. § 68-11-272, the Healthcare Quality Improvement Act ("HCQIA"). Under Tenn. Code Ann. § 68-11-272(c)(1), which is similar to the TPRL, records of a Quality Improvement Committee ("QIC") and statements by hospital officers, directors, healthcare providers, or employees relating to the activities of a QIC are confidential, privileged, and inadmissible in evidence. Further, under Tenn. Code Ann. § 68-11-272(c)(2), documents not produced specifically for use by a QIC, and are otherwise available from original sources, are not immune from discovery or admission into evidence even if the information was presented during a QIC proceeding.

On July 1, 2015, Summit filed a second motion for summary judgment in which it relied on the HCQIA instead of the TPRL. At the same time, it filed a motion in limine, a motion to strike, and a motion for a protective order. Summit noted that the HCQIA, like the TPRL, established a presumption that hospitals have complied with the required standards in the quality improvement process and are entitled to immunity from monetary damages unless the plaintiff overcomes the presumption.[1] Further, Summit contended that Dr. Pinkard could not produce admissible evidence to overcome the presumption because evidence derived from the fair hearing and the MEC was privileged and inadmissible under the HCQIA.

Dr. Pinkard opposed the motion for summary judgment arguing that Summit waived the privilege when it submitted the fair hearing transcript and other exhibits from

---

[1] The TPRL uses the term "peer review committee," whereas the HCQIA uses the term "quality improvement committee." Thus, when discussing the TPRL, we primarily refer to the activities of the peer review committee as the "peer review process;" however, when talking about the HCQIA, we primarily refer to the process of review as the "quality improvement process." The two are virtually the same.

the hearing with its first summary judgment motion. He also argued that not all evidence he relied on constituted records derived from a QIC; thus, this evidence was not privileged. Specifically, Dr. Pinkard contended that a QIC "'evaluates the safety, quality, processes, costs, appropriateness or necessity of healthcare services'" and Summit's fair hearing panel did not act as a safeguard for patient safety. Instead, he argued that the fair hearing panel operated as a "quasi-appellate safeguard" to protect physicians from the unfair actions of QIC's. Therefore, the fair hearing panel was not a QIC as defined by the HCQIA. In the alternative, Dr. Pinkard argued that the HCQIA violated the separation of powers provisions in the Tennessee Constitution, because it interfered with the court's discretion to make evidentiary decisions.

The trial court ruled that the fair hearing proceeding was not a QIC within the meaning of the statute; nevertheless, the MEC did meet the statutory definition. Therefore, all evidence derived from the activities of the MEC would be inadmissible. The court also took note of the "original source" exception to the statute, which exempts from the privilege documents not produced specifically for use by a QIC and are obtainable from an original source. Based on these rulings, the court ordered Dr. Pinkard to file a list of all admissible evidence in support of the material facts in accordance with the trial court's interpretation of the statute. With regard to Dr. Pinkard's claim that the HCQIA violated the separation of powers doctrine, the court declined to rule on the issue.

Summit then filed a motion to reconsider. In response to the motion, the trial court altered its ruling by holding that the MEC was a QIC; therefore, any information presented to the fair hearing panel that had been derived from the MEC was privileged and inadmissible under the HCQIA. The court also ruled the QIC privilege could not be waived by Summit; therefore, the privilege remained intact despite the fact that Summit submitted privileged evidence to support its first summary judgment motion.

Because the trial court's revised ruling precluded the admissibility of evidence in accordance with Tenn. Code Ann. § 68-11-272(c)(1), the court concluded that "the statutory prohibition of the admissibility of this evidence in this case would effectively deny this plaintiff his access to the courts of this state as this statute . . . is being applied." The court went on to rule:

> The Court, therefore, finds that the provisions of T.C.A. § 68-11-272(c)(1) as applied to the facts of this case is unconstitutional as a violation of the Tennessee separation of powers doctrine. Specifically, the Court finds that the statute - T.C.A. § 68-11-272(c)(1) - is unconstitutional as applied because it deprives the Court of its inherent authority to make evidentiary decisions that affect the heart of this case. The Court relies upon authority cited by the plaintiff in his "as applied" challenge, including *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, which stated as follows:

> While there are no precise lines of demarcation in the respective roles of our three branches of government, the traditional rule is that "the legislative [branch] [ha]s the authority to make, order, and repeal [the laws], the executive ... to administer and enforce, and the judicial ... to interpret and apply." *Underwood v. State*, 529 S.W.2d 45, 47 (Tenn. 1975) (quoting *Richardson v. Young*, 122 Tenn. 471, 125 S.W. 664, 668 (1910)). By the terms of our constitution, "[o]nly the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state, and this inherent power 'exists by virtue of the [Constitution's] establishment of a Court and not by largess of the legislature.'" *State v. Mallard*, 40 S.W.3d 473, 480-81 (Tenn. 2001) (citations omitted) (quoting *Haynes v. McKenzie Mem'l Hosp.*, 667 S.W.2d 497, 498 (Tenn. Ct. App. 1984)). In this context, this "[C]ourt is supreme in fact as well as in name." *Barger v. Brock*, 535 S.W.2d 337, 341 (Tenn. 1976).

417 S.W.3d 393, 402 (Tenn. 2013).

> Similarly, in *State v. Mallard*, the Tennessee Supreme Court states that the "legislature can have no authority to enact rules, either evidence or otherwise that <u>strike at the very heart</u> of a court's exercise of judicial power." 40 S.W.3d 473, 483 (Tenn. 2001)(emphasis added). Thus, the Court concludes that it cannot constitutionally apply T.C.A. § 68-11-272(c)(1) in a manner that would exclude all QIC related evidence of Summit's alleged bad faith.

After concluding that the statute, as applied to the facts of this case, was unconstitutional, the trial court granted Summit's motion for an interlocutory appeal pursuant to Tenn. R. App. P. 9. We also granted permission to appeal the constitutional issue and allowed the State of Tennessee to participate as an intervenor-appellant.

## ANALYSIS

Dr. Pinkard contends that Tenn. Code Ann. § 68-11-272(c)(1), as applied to the facts of this case, is unconstitutional because the General Assembly created an evidentiary rule that usurps the authority of the judiciary by barring the admission of all evidence coming from the peer review proceedings. Alternatively, Dr. Pinkard contends Summit waived the privilege by relying on privileged evidence to support its motion for summary judgment. Summit and the State of Tennessee insist the statute is constitutional because it affects the general welfare of the citizens of this state, the encroachment on the

judicial department's authority is minor, and the privilege is reasonable and workable within the evidentiary framework already adopted by the judiciary. Summit also insists it did not waive the privilege. We conclude that Summit and the State of Tennessee have the better argument on each issue.

## I. SEPARATION OF POWERS

Because the issue of constitutional interpretation is a matter of law, our review is de novo on the record with no presumption of correctness accorded to the trial court. *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009). An as-applied constitutional challenge to a statute requires the Court to examine how the statute operates against a particular litigant in light of the specific facts of the case. *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013). The Court begins the analysis with a presumption that the statute is constitutional. *Waters*, 291 S.W.3d at 882. Therefore, it must resolve any doubt it may have as to the validity of the statute in favor of its constitutionality. *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003).

Separation of powers is a fundamental principle of American constitutional government. *Underwood*, 529 S.W.2d at 47.[2] The citizens of Tennessee preserved this fundamental principle in article II, sections 1 and 2 of the Tennessee Constitution. *Id.* Section 1 divides our state government into three distinct departments—the legislative, the executive, and the judicial. Tenn. Const. art. II, § 1. Section 2 provides that one department shall not exercise any of the powers belonging to the others. Tenn. Const. art. II, § 2. In theory, the legislative department makes and repeals the law, the executive department administers and enforces the law, and the judicial department interprets and applies the law. *Underwood*, 529 S.W.2d at 47. However, the "theoretical lines of demarcation" between the three departments are often blurred, such that one department may need to encroach upon another in order to fully effectuate one of its powers. *Id.*; *Mallard*, 40 S.W.3d at 481. Hence, the Tennessee Supreme Court has held that, though the judiciary has the inherent power to establish evidentiary rules, the General Assembly may also do so, if it is in furtherance of its power to enact substantive law. *Mallard*, 40 S.W.3d at 481.

With the foregoing in mind, public policy concerns should drive the enactment of the statute in question. *Martin v. Lear Corp.*, 90 S.W.3d 626, 631 (Tenn. 2002). Nevertheless, the legislature cannot enact evidentiary rules "that strike at the very heart of a court's exercise of judicial power." *Mallard*, 40 S.W.3d at 483. This means, in part, that the statute cannot "impair the independent operation of the judicial branch" by

---

[2] In his farewell address, George Washington advised, "The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create . . . a real despotism." *Washington's Farewell Address, 1796*, available at avalon.law.yale.edu/18th_century/washing. asp.

eliminating the trial court's discretion to make evidentiary determinations of logical or legal relevancy. *Id.* To that end, the rule should be "reasonable and workable within the framework already adopted by the judiciary." *Id.* at 481.

By enacting the HCQIA, the General Assembly stated that it was "the policy of this state to encourage the improvement of patient safety, the quality of patient care and the evaluation of the quality, safety, cost, processes and necessity of healthcare services by hospitals, healthcare facilities and healthcare providers." Tenn. Code Ann. § 68-11-272(a). A key component of this process is the Quality Improvement Committee (QIC), which is defined as:

> [A] committee formed or retained by a healthcare organization, an activity of a healthcare organization, or one (1) or more individuals employed by a healthcare organization . . . the purpose of which is to evaluate the safety, quality, processes, costs, appropriateness or necessity of healthcare services.

Tenn. Code Ann. § 68-11-272(b)(4). The functions of a QIC include but are not limited to:

> (A) Evaluation and improvement of the quality of healthcare services rendered;
>
> (B) Determination that health services rendered were professionally indicated or were performed in compliance with the applicable standards of care;
>
> ....
>
> (D) Evaluation of the qualifications, credentials, competence and performance of healthcare providers or actions upon matters relating to the discipline of any individual healthcare provider;
>
> (E) Reduction of morbidity or mortality;
>
> ....
>
> (I) Supervision, education, discipline, admission, and the determination of privileges of healthcare providers;

(J) Review of professional qualifications or activities of healthcare providers; . . .

Tenn. Code Ann. § 68-11-272(b)(4).

To encourage the improvement of patient safety, the quality of patient care, and the evaluation of the quality, safety, and necessity of healthcare services, the General Assembly stated that "certain protections" must be provided to all who participate in or provide information to a QIC. Tenn. Code Ann. § 68-11-272(a) ("Tennessee further recognizes that certain protections must be available to these entities to ensure that they are able to effectively pursue these measures."). One of the protections provided by the HCQIA is that no healthcare organization, healthcare providers, committee members, or any person providing information to a QIC shall be held liable for damages or other relief resulting from any decision of a QIC, if made "in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist." Tenn. Code Ann. § 68-11-272(d)(2). Furthermore, all proceedings, actions and decisions by a QIC are presumed to have been completed in good faith and without malice, and any person alleging lack of good faith has the burden of proving bad faith and malice.[3] Tenn. Code Ann. § 68-11-272(g).

To further protect those who participate in a QIC or provide information or testimony to a QIC, the General Assembly mandated that all records of a QIC, including testimony or statements by persons relating to activities of the QIC, are not only confidential and privileged, they are protected from discovery or admission into evidence. Tenn. Code Ann. § 68-11-272(c)(1).

> Records of a QIC and testimony or statements by a healthcare organization's officers, directors, trustees, healthcare providers, administrative staff, employees or other committee members or attendees relating to activities of the QIC shall be confidential and privileged and shall be protected from direct or indirect means of discovery, subpoena or admission into evidence in any judicial or administrative proceeding. Any person who supplies information, testifies or makes statements as part of a QIC may not be required to provide information as to the information, testimony or statements provided to or made before such a committee or opinions formed by such person as a result of committee participation.

*Id*.

---

[3] The HCQIA also states: "Any person providing information to a QIC is presumed to have acted in good faith and without malice. Any person alleging lack of good faith has the burden of proving bad faith and malice." Tenn. Code Ann. § 68-11-272(f).

Nevertheless, the HCQIA provides an exception to the above; it is known as the "original source" exception. *See* Tenn. Code Ann. § 68-11-272(c)(2). Pursuant to this exception, any information, documents or records that were not produced for use by a QIC, or which were not produced by persons acting on behalf of a QIC, and are available from original sources, are not immune from discovery or admission into evidence even if the information was presented during a QIC proceeding.[4] Tenn. Code Ann. § 68-11-272(c)(2). Furthermore, persons who provided testimony or information to or as part of a QIC are not exempt from discovery and are not prohibited from testifying as to their knowledge of facts or their opinions. *Id*.; *see Powell v. Community Health Systems, Inc.*, 312 S.W.3d 496, 510 (Tenn. 2010); *see also Stratienko v. Chattanooga–Hamilton County Hosp. Auth.*, 226 S.W.3d 280, 287 (Tenn. 2007) (Holding that, under the TPRL, information that had been furnished to a peer review committee by original sources "outside the committee" could be obtained directly from the original sources, unless otherwise privileged).[5]

We find it significant that the original source exception to the HCQIA privilege parallels the work product doctrine in many respects.[6] *See* Tenn. R. Civ. P. 26.02(3); *see also* Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 8-1[i] at 8-25 (3d ed. 2009). Like the original source exception, the work product doctrine does not prevent the discovery of facts from the original source of the information. *Id*. § 8-1[i] at 8-26.

---

[4] Tenn. Code Ann. § 68-11-272(c)(2) states:

Any information, documents or records, which are not produced for use by a QIC or which are not produced by persons acting on behalf of a QIC, and are otherwise available from original sources, shall not be construed as immune from discovery or use in any judicial or administrative proceeding merely because such information, documents or records were presented during proceedings of such committee.

[5] *Powell* and *Stratienko* concerned the now repealed TPRL privilege under Tenn. Code Ann. § 63-6-219(e). *Powell*, 312 S.W.3d at 513; *Stratienko*, 226 S.W.3d at 287. The TPRL privilege and the current HCQIA privilege are substantially similar. Tenn. Code Ann. § 53-6-219(e) provides, "All information, interviews, incident or other reports, statements, memoranda or other data furnished to any committee as defined in this section and any such findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged…" Tenn. Code Ann. § 53-6-219(e) also contained an original source exception.

[6] The work product doctrine encourages parties to diligently prepare their cases by protecting the materials a party or her representative has produced in anticipation of litigation. Tenn. R. Civ. P. 26.02(3); Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 8-1[i] at 8-25 (3d ed. 2009). It does not, however, prevent the discovery of any facts learned by the adverse party or her representative. *Id*. § 8-1[i] at 8-26. Thus, while a litigant would not gain access to any of the witness interviews the adverse party had conducted in anticipation of litigation, the litigant could discover the facts revealed in those communications by personally interviewing the witnesses. *See id*. § 8-1[i] at 8-28.

Thus, while the work product doctrine prohibits a litigant from obtaining from the adverse party its work product, the litigant may obtain substantially the same information directly from the original sources. *See id.* § 8-1[i] at 8-28. Although the HCQIA privilege is problematic, it does not prohibit Dr. Pinkard from obtaining evidence that goes to the heart of the case from the original sources.

With regard to Dr. Pinkard's contention that the privilege created by Tenn. Code Ann. § 68-11-272(c)(1) constitutes an evidentiary rule that usurps the authority of the judiciary, we note that our courts recognize many statutorily mandated privileges. Moreover, although Tennessee Rule of Evidence 501 expresses the basic concept undergirding our evidentiary rules that the trier of fact should have access to any relevant evidence to facilitate the ascertainment of truth, the rule contemplates statutorily mandated exceptions.[7] *See* Tenn. R. Evid. 501, Adv. Comm'n Cmt. Recognized exceptions to Rule 501 include the accident report privilege, Tenn. Code Ann. § 55-10-114(b), the legislative-committee-witness privilege, Tenn. Code Ann. § 24-7-114, the news reporter's privilege, Tenn. Code Ann. § 24-1-208, and the clergy-penitent privilege, Tenn. Code Ann. § 24-1-206. Tenn. R. Evid. 501, Adv. Comm'n Cmt.

Admittedly, while our evidentiary rules seek to illuminate the truth, privileges effectively "'shut out the light.'" *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 525 (Tenn. 2010) (quoting 1 *McCormick on Evidence* § 72, at 339 (Kenneth S. Broun, ed., 6th ed. 2006)). Nevertheless, we recognize them "when they protect values deemed even more important than the ascertainment of truth." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 5.01[4][a], at 5-12 (6th ed. 2013). For example, the attorney-client privilege seeks to encourage honest communication between an attorney and his or her client, thus leading to more effective representation. *Culbertson v. Culbertson*, 393 S.W.3d 678, 684 (Tenn. Ct. App. 2012); *see* Tenn. Code Ann. § 62-1-116. The spousal communication privilege protects the confidential communication between spouses, thus providing support to a relationship with considerable social significance. *State v. Price*, 46 S.W.3d 785, 799 (Tenn. Crim. Ct. App. 2000); *see* Tenn. Code Ann. § 24-1-201(b). Similarly, the HCQIA privilege protects an overriding interest

---

[7] Tennessee Rule of Evidence 501 provides:

Except as otherwise provided by constitution, statute, common law, or by these or other rules promulgated by the Tennessee Supreme Court, no person has the privilege to:

(1)     Refuse to be a witness;
(2)     Refuse to disclose any matter;
(3)     Refuse to produce any object or writing; or
(4)     Prevent another from being a witness or disclosing any matter or producing any object or writing.

in patient safety, and it achieves that objective by encouraging candor within a hospital's quality improvement process. *See* Tenn. Code Ann. § 68-11-272(a).

Because the General Assembly enacted the privilege in furtherance of the public policy of this state, the privilege achieves that objective by encouraging candor within a hospital's quality improvement process, and the privilege is reasonable and workable within the framework of evidentiary rules already recognized by the judiciary, *see Mallard*, 40 S.W.3d at 481, we are unable to conclude that Tenn. Code Ann. § 68-11-272(c)(1), as applied to the facts of this case, is unconstitutional.

## II. WAIVER

The constitutionality of the HCQIA notwithstanding, Dr. Pinkard contends that Summit waived the HCQIA privilege by utilizing privileged evidence to support its motion for summary judgment. The trial court determined that the HCQIA privilege under Tenn. Code Ann. § 68-11-272(c)(1) is not waivable and we agree with this ruling.

Because the interpretation of a statute is a question of law, we review the trial court's decision de novo without any presumption of correctness. *Tidwell v. City of Memphis*, 193 S.W.3d 555, 559 (Tenn. 2006).

The Tennessee Supreme Court addressed a substantially similar waiver issue in the context of the TPRL in *Powell*, 312 S.W.3d at 499 prior to the enactment of the HCQIA. The rules of statutory construction permit us to "presume that the General Assembly knows the 'state of the law.'" *Lee Medical, Inc.*, 312 S.W.3d at 527 (quoting *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 683 (Tenn. 2005)). Therefore, we may presume the General Assembly was familiar with the manner in which our Supreme Court interpreted the peer review privilege under the TRPL prior to enacting the HCQIA. *Id.* (We may presume the General Assembly was aware of its own prior enactments and is familiar with the manner in which our courts have interpreted those enactments).

Because *Powell* interpreted the TRPL and not the HCQIA, *Powell* is not controlling; nevertheless, it is persuasive because the TPRL was superseded by the HCQIA, and the TPRL and the HCQIA are substantially similar in six material respects. First, each statute expressly states that its purpose is to promote confidentiality within a hospital's quality improvement process to ensure effective evaluation measures. *See* Tenn. Code Ann. § 53-6-219(b)(1); *see also* Tenn. Code Ann. § 68-11-272(a). Second, both statutes establish a presumption that healthcare entities have conducted the peer review process in good faith and without malice. *See* Tenn. Code Ann. § 53-6-219(d)(3); *see also* Tenn. Code Ann. § 68-11-272(g). Third, under the TPRL and the HCQIA, all participants within the peer review process are entitled to immunity from damages unless the plaintiff rebuts the presumption. *See* Tenn. Code Ann. § 53-6-219(d)(1); *see also*

- 13 -

Tenn. Code Ann. § 68-11-272(g). Fourth, the privilege created by the HCQIA mirrors the privilege created by the TPRL.[8] Fifth, both statutes contain an "original source" exception to the privilege. *See* Tenn. Code Ann. § 53-6-219(e); *see also* Tenn. Code Ann. § 68-11-272(c)(2). Sixth, neither contains a provision that expressly authorizes the waiver of the statutory privilege.

Furthermore, *Powell* is significant for three primary reasons. First, our Supreme Court determined that no individual held the TPRL privilege because it was not created for the benefit of a specific individual; rather, it "[was] intended to benefit the entire peer review process." *Powell*, 312 S.W.3d at 513. Second, the Court held that the TPRL privilege could not be waived. *Id*. Third, the General Assembly was aware of the Court's interpretations of the TPRL prior to the enactment of the HCQIA and the HCQIA contains no provisions that would require a different interpretation of the peer review privilege.

*Powell's* interpretation of the TRPL privilege is also significant because most privileges exist to protect a particular individual called the "holder" and only the holder of the privilege can waive it. Cohen, *supra*, § 5.01[4][e], at 5-13. For example, the client serves as the holder of the attorney-client privilege, and both spouses serve as the holders of the spousal communication privilege. *Culbertson*, 393 S.W.3d at 684 (attorney-client privilege); *Price*, 46 S.W.3d at 799 (spousal privilege). Moreover, these privileges are waivable.[9] In the case of the attorney-client privilege, it is automatically waived when the

---

[8] Under Tenn. Code Ann. § 68-11-272(c)(1) of the HCQIA, "Records of a QIC and testimony or statements by a healthcare organization's officers, directors, trustees, healthcare providers, administrative staff, employees or other committee members or attendees relating to activities of the QIC shall be confidential and privileged…." Likewise, Tenn. Code Ann. § 53-6-219(e) of the TPRL provided, "All information, interviews, incident or other reports, statements, memoranda or other data furnished to any committee as defined in this section and any such findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged. . . ."

[9] Other privileges include but are not limited to the accountant-client privilege, *see* Tenn. Code Ann. § 62-1-116, and the psychologist-patient privilege. *See* Tenn. Code Ann. § 63-11-213. Like the attorney-client and spousal communication privilege, the client and the patient are the holders of both privileges and the privileges are waivable by the holders. *Federal Ins. Co. v. Arthur Anderson & Co.*, 816 S.W.2d 328, 330 (Tenn. 1991) (accountant privilege); *see* Tenn. Code Ann. § 63-11-213 (Confidential communications between the psychologist and patient "are placed upon the same basis as those provided by law between attorney and client."). Moreover, each of these privileges has exceptions. For example, the accountant-client privilege contains an exception for "procedures monitoring the propriety of the actions of the accountant, such as peer review proceedings and ethical investigations." Cohen, *supra,* § 5.06 at 5-23. The psychologist-patient privilege contains an exception in cases involving threats of bodily harm, child abuse, or "when the patient files suit placing his or her mental condition at issue." *Id.* § 5.07[1] at 5-24 and § 5.07[3] at 5-25; Tenn. Code Ann. § 33-3-206 (threats of bodily harm); Tenn. Code Ann. § 37-1-614 (sexual abuse); *see Kirchner v. Mitsui & Co.(U.S.A.), Inc.*, 184 F.R.D. 124, 129 (M.D. Tenn. 1998) (mental condition).

client commences a legal malpractice action against the attorney. *See* Cohen, *supra*, § 5.03[2][d] at 5-20. For similar reasons, the spousal communication privilege is automatically waived in divorce cases. *See* Tenn. Code Ann. § 24-1-201(b); *see also* Cohen, *supra*, § 5.17[7] at 5-40. Because the Supreme Court's interpretation of the TPRL privilege was significantly different from most privileges, it stands to reason that the General Assembly would have made substantive changes in the HCQIA if it disagreed with the Court's interpretation of the TPRL privilege in *Powell*. Nevertheless, because *Powell* is merely persuasive, we must determine whether there is a holder of the HCQIA privilege who may waive it and, if not, whether the court may waive the privilege.

Similar to the purpose of the HCQIA, the stated purpose of the TPRL peer review privilege was "to benefit the entire peer review process, not simply the individuals participating in the process." *Powell*, 312 S.W.3d at 513 (citations omitted).

> The [TPRL] peer review privilege is intended to benefit the entire peer review process, not simply the individuals participating in the process. The proper functioning of the peer review process hinges on the assurance to all persons participating in it—the members of the peer review committees, the persons under review, and the persons who provide information and opinions during the peer review process—that the information and opinions provided and discussed during the proceeding will remain confidential. Any breach in this confidentiality undermines the process. Therefore, we are hesitant to empower persons participating in the process to waive confidentiality unilaterally when the General Assembly itself has recognized no exceptions to the confidentiality requirement.

> Under Tennessee law, waiver of a statutory privilege should not be permitted if the waiver undermines public policy or impairs the rights of third parties. Permitting participants in a peer review proceeding to waive the privilege—no matter how meritorious the justification—not only undermines the efficacy of the peer review process but also adversely affects those who provided information or opinions to the peer review committee in reliance on the statutory assurance of confidentiality. Other courts construing peer review statutes similar to Tennessee's that do not contain express waiver provisions have concluded that judicially-created waivers are inappropriate.

*Id*. (internal citations and footnotes omitted).

Based on the foregoing analysis, the Court concluded that the TPRL peer review privilege was intended to benefit the entire peer review process, not simply the individuals participating in the process; thus, no individual could be the holder of the privilege. *Id*. It also concluded that the courts should not judicially engraft a waiver

provision onto the TPRL because that prerogative should be left up to the General Assembly. *Id*.

Similar to the TPRL, the stated purpose of the HCQIA is to encourage the improvement of patient safety and the quality of patient care. Tenn. Code Ann. § 68-11-272(a). To fulfill this purpose, the General Assembly stated that "certain protections" must be provided to all who participate in or provide information to a QIC. *Id*. As discussed in more detail earlier, the protections were for the benefit of, *inter alia*, those who participate in a QIC or provide information or testimony to a QIC. In support of this protection, the statutory scheme provides that all records of a QIC, including testimony or statements by persons relating to activities of the QIC, are not only confidential and privileged they are protected from discovery or admission into evidence. Tenn. Code Ann. § 68-11-272(c)(1). Moreover, "[a]ny person who supplies information, testifies or makes statements as part of a QIC may not be required to provide information as to the information, testimony or statements provided to or made before such a committee or opinions formed by such person as a result of committee participation." *Id*. Thus, the beneficiaries of the statutory privilege are all who participate in or provide information to a QIC. Summit is merely one of the beneficiaries. As a consequence, Summit is not "the holder" of the HCQIA peer review privilege. Because it is not the holder of the privilege, Summit cannot waive the privilege.

As was the case with the TPRL, the HCQIA does not contain a provision that permits the waiver of the privilege. *See Powell*, 312 S.W.3d at 512 ("Unlike the peer review statutes in other states, Tenn. Code Ann. § 63-6-219(e) does not contain a provision expressly permitting the waiver of the privilege. Nor does it contain any express exceptions to the confidentiality rule."). "In the absence of a statute to the contrary, only the person entitled to the benefit of a privilege may waive the privilege. *Id*. (citing *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984)). Nevertheless, "[t]he ability to waive a privilege, even a statutory one, is not without limit." *Id*.

"[O]ne may waive by agreement the benefit of a statutory provision, *unless public policy or the rights of third parties would be violated*." *Id*. (quoting *Black Diamond Coal Mining Co. v. Rankin*, 98 S.W.2d 311, 312 (Tenn. 1936)) (emphasis added). In this case, the third parties are those who participated in the quality improvement process and who provided information, documents and/or opinions who may not have participated but for the expectation of confidentiality. *See id*. at 513. Realizing that any breach of this confidentiality could undermine the quality improvement process, we cannot "empower persons participating in the process to waive confidentiality unilaterally when the General Assembly itself has recognized no exceptions to the confidentiality requirement." *Id*. Moreover, other courts construing peer review statutes similar to ours that do not contain express waiver provisions have concluded that judicially-created waivers are inappropriate. *Id*. (citations omitted). Further the Supreme Court stated that "the proper

course is to defer to the General Assembly, as the author of the peer review privilege, to determine if and under what circumstances the privilege may be waived." *Id*.

Based on the reasoning in *Powell* and the substantial similarities in the two statutory schemes, we have concluded that no individual is the holder of the HCQIA privilege and that the HCQIA privilege cannot be waived. The fact that the privilege cannot be waived is problematic; nevertheless, we may not take the peer review privilege lightly "because weakening this privilege could undermine the confidentiality that the privilege is intended to protect." *Id*. at 512. In this case, no person is the holder of the privilege and the HCQIA statutory scheme does not expressly authorize the waiving of the privilege. Therefore, we affirm the trial court's ruling that the privilege cannot be waived.

### IN CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded with costs of appeal assessed against the appellee, John F. Pinkard, M.D.

_____
FRANK G. CLEMENT, JR., P.J., M.S.