FILED
09/28/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 19, 2020 Session

## TRAVIS KANIPE v. PRAGNESH PATEL MD

**Appeal from the Circuit Court for Hamblen County**
**No. 14-CV-061      Thomas J. Wright, Judge**

_____

### No. E2019-01211-COA-R3-CV
_____

This appeal arises from a health care liability lawsuit.  In 2013, Sandra Kanipe ("Ms. Kanipe") died from an undiagnosed aortic dissection while in the care of Dr. Pragnesh Patel, M.D. ("Dr. Patel").  Travis Kanipe ("Mr. Kanipe"), Ms. Kanipe's son, sued Dr. Patel in the Circuit Court for Hamblen County ("the Trial Court").  After a trial, the jury found in favor of Dr. Patel.  The Trial Court granted Mr. Kanipe's motion for a new trial on grounds that Dr. Patel had, through his testimony, shifted blame to a non-party despite having never pled comparative fault.  After a second trial, the jury found in favor of Mr. Kanipe.  Dr. Patel appeals, arguing among other things that he never shifted blame.  From our review of the record, we conclude that Dr. Patel did, in fact, shift blame to a non-party when he testified in the first trial that the nurses never notified him of Ms. Kanipe's ongoing chest pain.  In view of our Supreme Court's holding in _George v. Alexander_, 931 S.W.2d 517 (Tenn. 1996), the Trial Court did not abuse its discretion in ordering a retrial.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Raymond G. Lewallen, Jr., Knoxville, Tennessee, for the appellant, Pragnesh Patel, M.D.

Leslie A. Muse and Grant E. Mitchell, Knoxville, Tennessee, and Tasha C. Blakney, Knoxville, Tennessee, for the appellee, Travis Kanipe, as Administrator of the Estate of Sandra Kanipe, deceased.

# OPINION

## Background

Early on December 31, 2012, Ms. Kanipe, a 66-year old Hamblen County resident, was taken by EMS to the Emergency Department at Morristown-Hamblen Hospital. There, she complained of chest pains that radiated to her neck and jaw. Emergency Department physician Dr. Jackie Livesay attended to Ms. Kanipe. Dr. Livesay then consulted with Dr. Patel, the cardiologist on call. Ms. Kanipe thereafter was Dr. Patel's patient. At 10:00 a.m., Dr. Patel examined Ms. Kanipe. Dr. Patel's admitting diagnosis for Ms. Kanipe was unstable angina, or acute coronary syndrome. Nitroglycerin was administered to Ms. Kanipe, which helped initially. Dr. Patel decided that he would wait until the next day to determine what sort of testing Ms. Kanipe should undergo moving forward. Orders were issued that Dr. Patel be called for questions, orders, or changes in Ms. Kanipe's condition. Dr. Patel went home. At 12:07 p.m., Ms. Kanipe was transferred from the Emergency Department to the monitored telemetry floor of the hospital. Ms. Kanipe reported her pain as 6 out of 10 at that time.

At 3:30 p.m., Nurse Amy Crespo ("Nurse Crespo")[1] phoned Dr. Patel. This call was to prove one of the most contested parts of the case. Dr. Patel would testify later that he never was notified of Ms. Kanipe's ongoing pain, and that the call from Nurse Crespo was just to see if he had any more orders for medication *in case* Ms. Kanipe needed it. Nurse Crespo would testify, on the other hand, that she told Dr. Patel in no uncertain terms that Ms. Kanipe was continuing to experience chest pain. In either event, Dr. Patel put in an order for Ultram and Zofran, medications for pain and nausea. Dr. Patel never re-evaluated Ms. Kanipe. At 1:47 a.m. the following morning, Ms. Kanipe was pronounced dead. An autopsy revealed that Ms. Kanipe died from an aortic dissection.

In April 2014, Mr. Kanipe filed a health care liability lawsuit against Dr. Patel in the Trial Court alleging negligence in the medical treatment provided to Ms. Kanipe.[2] Dr. Patel did not plead the comparative fault of any nurse in his answer, a fact that was to prove significant later. The matter was tried before a jury beginning April 3, 2017 through April 11, 2017. Among the witnesses to testify for Mr. Kanipe was Dr. Bryan Barksdale ("Dr. Barksdale"), a cardiologist from the University of Michigan. Dr. Barksdale was asked how aortic dissections are diagnosed and whether Dr. Patel's care for Ms. Kanipe met the applicable standard of care:

---

[1] Amy Crespo later married and became Amy Cochran. We refer to her by the Crespo surname since that is what she went by at the times relevant to this case.

[2] Mr. Kanipe sued certain other parties, as well. Dr. Patel is the sole remaining defendant in this appeal.

Q. Now, doctor, as a result of your review of medical records, do you have an opinion within a reasonable degree of medical certainty as to whether or not the care provided by Dr. Patel complies or does not comply with the standard of care as it applied in Morristown in 2012?

A. I do. I do not think it complies, no. The thing that worries me the most, you've got a patient that's continuing to have chest pain. They give her repeated doses of nitroglycerin. No one ever calls the doctor. There's no order in the chart that says "If she continues to have chest pain, call me." She required several doses of nitroglycerin. The pain never went away. She's got normal EKGs, normal troponins. Something else is going on. Either take her to the cath lab or get a CT. Don't wait around until the next day….

***

Q. Do you have an opinion within a reasonable degree of medical certainty as to what a CT more likely than not would have shown if one had been performed?

A. She had absolutely a dissection. That's easy to say in hindsight. I know what she had. But there's no question in my mind, a CT at 1:00, 2:00, 6:00 in the morning, they would have diagnosed the dissection and gotten her to appropriate care.

Q. That was my next question, doctor. If they had diagnosed an aortic dissection, what would have been the appropriate care or what would have been required according to the standard of care?

A. To get her to a cardiovascular surgeon for urgent, emergent surgery.

Q. If a heart catheterization would have been performed that day, do you have an opinion as to what it would have likely shown?

A. It would have shown a dissection.

Q. And is that within a reasonable degree of medical certainty?

A. Yes.

Q. And would the treatment have been the same regardless of how it was diagnosed?

A. Yes, regardless. The beauty of the CT scan, as I mentioned, it's a lot quicker. You lay them out, 15 minutes for a heart cath. You have to get them down, get them prepped, get them ready. It's an hour procedure. A CT scan takes 15 minutes, max.

Q. Doctor, do you have an opinion whether, with treatment, Ms. Kanipe would more likely have survived this illness?

A. I think the earlier they would have gotten her to surgery, the better. It's like I said, it's a 1- to 2-percent increase in mortality every hour you wait. In her favor, she didn't smoke, she had good kidney function, she didn't have

hypertension. She wasn't a diabetic. So in this event, she's about the lowest risk. I can quote from this international study I referred to, and the last update was in 2009. In the best of circumstances, the mortality is 5 percent if you can get them to surgery. I would say, on average in the United States, it's about 20 percent. In other words, even if you get them to surgery, they will die. But 20 percent beats the heck out of an 80-percent chance of dying.

Q. That was my next question. If the mortality for her would have been at the 20-percent range, does that mean it's an 80-percent chance that she more likely -- she would have survived?

A. Survived the surgery. A few percent have complications and don't get out of the hospital. But like I said, she was about as low a risk. Just to do a straightforward bypass, we think a risk of 2 percent is pretty high. We like to say it's 1 to 1 and-a-half percent. So 20 percent is a high risk, don't get me wrong. But we don't have any choice. There's no other options to save the patient.

Q. And do you believe that the negligence of Dr. Patel was a substantial factor in the death of Ms. Kanipe?

A. Yes.

On cross-examination, Dr. Patel's attorney pursued the issue of whether Dr. Patel was notified of Ms. Kanipe's ongoing pain following his initial examination of her. Mr. Kanipe's attorney objected:

Q. All right. And you certainly read the admitting orders that say, No. 20, quote: "Call admitting M.D." -- that's Dr. Patel -- "for questions, orders, or changes in patient condition." That order was in this chart, correct?

A. Correct.

Q. And as you told us, no one ever called Dr. Patel, correct?

MS. MUSE: Your Honor, I object. There was no comparative fault allegation here. They're not a party. This is inappropriate.

MR. O'KANE: I'm just picking up on what he said.

THE COURT: Overruled. Continue.

Dr. Barksdale testified critically regarding the language used in Dr. Patel's order in Ms. Kanipe's chart:

He clearly -- I don't think his order was real forcible, "Call me if there's" -- I would put danged-gum well, "If there's any pain, if the patient changes and had to have more nitroglycerin, you call me immediately."

-4-

I don't think his order was very forcible. I don't want to get into that. Even when she died, he didn't come into the hospital. Maybe the nurses are afraid to call him. I don't know what the problem was.

Dr. Patel took the stand and testified regarding what he knew about Ms. Kanipe's condition and when. On cross-examination, Dr. Patel stated as follows, in relevant part:

Q. So anywhere in this does it say aortic dissection is a medical emergency, but you should consider it and then wait 24 hours to either confirm or not confirm the diagnosis? That would be silly, wouldn't it?
A. Well, that would be silly. But again, what I was trying to get at is that if you have a diagnosis or symptoms fit the picture then it is okay to wait, because you don't consider -- I did not consider aortic dissection in Ms. Kanipe. Her presentation was -- 90 percent of the people present with severe chest pain with aortic dissection. The likelihood of three out of -- if you take even the statistics of Ms. Kanipe having an aortic dissection based on all the studies that you have shown, 3 out of 100,000 people have aortic stenosis -- or aortic dissection, I'm sorry. Of that, if you take away 50 percent of people who don't present with classic ripping pain, that makes it 1.5 out of 100. And 90 percent of those will at least have severe or the worst pain ever. That makes it just 10 percent who present without the -- with the diagnosis who you're going to miss, which is .15 out of 100,000.
Q. Okay. So at 12:07, when she was taken from the emergency room to the floor, her pain spiked. And if you need to look at it, it is at Page 15 of the medical record but it's also on the screen behind you, sir.
A. Yes.
Q. All right. So at 12:07, when she was taken to the floor and her pain was documented as a 6 out of 10, did that confirm an alternate diagnosis for you?
A. I was not notified of any of that.

***

Q. Doctor, today it's your testimony that you would have expected to have been notified of this 6 out of 10, correct?
A. Probably so.
Q. That's because this is a clinically significant finding, isn't it? This is important in evaluating Ms. Kanipe's status, isn't it?
A. Well, what I can always say is that the order set pathway says to notify a physician of any change of condition. If there is a change in pain, worsening of pain, probably so.

Q. So now, when this case was brought against you, you have an opportunity through the legal process to blame other people, don't you?

A. I'm not going to blame anybody.

***

Q. If you'd been aware of this, the standard of care would have required you to do something different, wouldn't it?

A. The standard of care would not have required me to do something different. The standard of care would be that if I was notified, depending on what was conveyed to me, I would have gone back in and reevaluated Ms. Kanipe.

***

Q. So let's move on and let's look at her pain down here throughout the day. Next slide, it's Page 76 in the medical records. It documents 2, 2, and 7. So we know that she did continue to have pain throughout the day, correct?

A. From the documentation, yes.

Q. And that was clinically significant, wasn't it?

A. Probably so.

Q. Okay. And if you had known all of these things -- that she had a pain spike, that she had a normal troponin, and that she continued to have pain -- the standard of care would have required you to do something different, wouldn't it?

A. The standard of care would have been, again, that I go in -- I've been notified of the pain, I go and evaluate the patient and then make whatever decision I need to make.

Q. Okay. Doctor, you were notified of the pain, weren't you?

A. No, I was not.

***

Q. A conversation is a two-part endeavor, isn't it? They can ask you stuff and you can tell them stuff, can't you?

A. It can be. But if it wasn't significant -- they didn't notify me that she's having more chest pain.

Q. Okay. But --

A. Since they didn't notify me and I knew she was pain-free, I didn't ask if she was having chest pain.

Q. You didn't ask if she was having chest pain?  Okay.  Did you ask them what the results of the second troponin were?
A. No, I did not.
Q. Okay.
A. I assumed it was negative because they did not notify me.  The standard of care at Morristown was that they would notify you immediately if there were -- if the tests showed any abnormalities.

Mr. Kanipe called Nurse Crespo to testify on rebuttal.  According to Nurse Crespo, during her 3:30 p.m. phone call to Dr. Patel, she informed him of Ms. Kanipe's ongoing pain.  Nurse Crespo testified, in pertinent part:

Q. Can you tell us why it is that you reached out and called Dr. Patel that afternoon?
A. The reason that I had called Dr. Patel was I had given some nitro sublingual per my standing orders for the chest pain.
Q. How many times had you given that sublingual nitro per the standing order?
A. I gave it twice, and I don't exactly know why a third dose wasn't given.  It could have been that she had become so hypotensive that I couldn't give it again, because I know that we were checking the blood pressure in between --
Q. Okay.
A. -- her standing orders.  And the whole reason for the call was to let him know that this had not worked.  The chest pain continued, along with some nausea.  You know, it was more to raise the red flag to him that I didn't have anything else to do for her for the chest pain, and it did continue.
Q. Do you recall whether you specifically told him that the nitroglycerin that you were giving her for pain was not working anymore?
A. Yes.
Q. All right.
A. That's a thing for the nurses.  If the nitro doesn't work, you have to call the physician.
Q. Do you recall specifically making him aware that the patient at that time was experiencing pain, actively experiencing pain at that time?
A. Yes, that the chest pain had not subsided.  Actually, never did it go to a 0 with me on shift.
Q. All right. To the extent that there has been some perhaps guess or speculation that perhaps the reason that you called Dr. Patel is because you were -- it was getting later in the day or it was getting close to the end of your

shift and you just wanted clarification about this particular patient or this case, what is your response to that testimony?

A. No, I was just calling to let him know what was going on, to see if there was anything else we needed to be doing, other tests, anything else, you know. Not just a bandaid for the symptoms, per se.

Q. Did you specifically tell Dr. Patel that you were developing concerns yourself as you followed her from a nursing standpoint about this particular patient?

A. I said I was concerned because she continued to hold her chest and she said something wasn't right. You know, she knew something wasn't right. And that's all that I said.

Q. And you told him that?

A. Yes.

Q. Did you call him for the specific purpose of getting prescriptions?

A. No. I actually wasn't expecting a med order, honestly.

Q. What were you expecting?

A. Possibly an order for another test or him to come up there and see her, because the nitro didn't work. I didn't know he was going to give me that; but because he did, I have to write it down as the order.

At the conclusion of trial, the jury found in favor of all defendants, including Dr. Patel. The Trial Court approved the verdict as thirteenth juror. Mr. Kanipe subsequently filed a motion for a new trial. Upon hearing the motion, the Trial Court initially reaffirmed its earlier approval of the verdict. However, the Trial Court went on to enter an order granting Mr. Kanipe's motion and ordering a new trial on grounds that Dr. Patel had, through his testimony, shifted blame to a non-party despite never having pled comparative fault. In its oral ruling attached to its order, the Trial Court stated, in relevant part:

> At the end of the day, though, I just really feel that Dr. Patel pointed the finger at the nurses and said "I'm not at fault because they didn't tell me." And he says on Page 131 -- and other places, but specifically there, that "I was never notified that she was having chest pains, so there was no reason to go for a second imaging study."

> ***

> And, you know, for the record, for the Court of Appeals whenever this gets there at some point in time, seriously -- you know, I guess I see witnesses and try to evaluate them for a living. And seriously, the plaintiff's counsel was surprised at trial, and I let them put on their rebuttal witness, the nurse, because I believed that they were surprised at trial.

-8-

Having reviewed the transcript, I don't think they should have been surprised at trial about the denial of getting the information. I understand why it was overlooked, because you've got a medical record and you had nursing testimony that indicated that he had been notified.

And specifically, the record is not definitive as to the conversation, obviously, or Dr. Patel wouldn't be able to testify one way and the nurse another one on what the nature of the conversation was. And what actually happened, who knows?

But I believe that counsel for plaintiff was surprised at trial. But I also say it doesn't matter, based on this George [v. Alexander] case, which basically says in this case, to me, if being notified of continued pain had made a different result potential -- nothing's for sure, obviously, in these cases -- for Ms. Kanipe, then you're shifting the blame by continuing to assert that "The nurses didn't tell me. They didn't tell me."

And let's give Mr. -- Dr. Patel the benefit of the doubt. They didn't tell him. Well, it's the danged nurses' fault, then. But unfortunately that ship has sailed, I believe.

So obviously, the plaintiffs don't think that's correct, and there's at least one nurse that says it's not.

I guess it's frustrating for everybody. I certainly understand how frustrating it is to Dr. Patel's attorneys, when you've got his deposition transcript where he says "I was never notified of any increase in pain throughout the whole hospitalization."

So -- but he still can't throw off on them. And maybe he didn't anticipate that it was going to be a throw-off on the nurses before the trial; but essentially, that's the way it strikes me, is that he did.

So pointing the finger back at the nurses and saying, "If they had notified me, things would have been different. I had an order in the file that said 'Notify me of changes in pain.'" She had changes in pain, we all know that. The first one was at 12:07. We know the nurses dropped the ball on that, apparently. So it was 6 out of 10 when they moved her to the floor. Why didn't they call him then? It may be that the nurses are 100-percent liable in the case, and they've been let off.

Here's the deal. I can't try your case for you, so I'm saying that we had an allegation of comparative fault in here that wasn't pled, so that's not a fair trial.

But I can't make you allege the comparative fault of the nurses, and I don't see how you can go back through the trial without doing that, if Dr. Patel's testimony is not going to change. And obviously, you don't anticipate that happening.

Dr. Patel sought an interlocutory appeal at this stage, which the Trial Court allowed. However, Dr. Patel's application was denied by the Court of Appeals of Tennessee and the Tennessee Supreme Court. Thus, a second trial was conducted in January of 2019. Before the retrial, the parties contested certain evidentiary matters. Dr. Patel filed a motion in limine seeking a ruling allowing him to testify to what he knew about Ms. Kanipe's condition merely as a factual matter, not as a way of shifting blame. The Trial Court ruled that Dr. Patel and Nurse Crespo could testify about the 3:30 phone call, but it would instruct the jury that there was no other party to potentially blame besides Dr. Patel.

Dr. Patel also sought, on the basis of peer review privilege, to exclude any evidence reflecting that since the underlying events of the case he had voluntarily relinquished his privileges to practice at Morristown-Hamblen Hospital. The Trial Court entered an order denying Dr. Patel's request, stating in pertinent part:

> Plaintiff correctly points out that the Court's previous exclusion of this information allowed Dr. Patel to testify in a way that likely create[d] the false impression that he maintained privileges at the hospital and was continuing to care for patients there. In evaluating the discrepancy between the testimony of Dr. Patel and the nurse who called him on the afternoon before Mrs. Kanipe's death, the jury should be allowed to consider the fact that Dr. Patel no longer sees patients at that hospital and that Dr. Patel voluntarily gave up that right in lieu of going through a disciplinary proceeding at the hospital.
>
> Furthermore, it seems clear to the undersigned that surrendering medical privileges at a hospital in lieu of going through a disciplinary proceeding is a factor to be considered in assessing the competence and qualifications of an expert witness. The Tennessee Legislature clearly found that such actions by health care providers can be an important consideration for the health care consumer when deciding whether to commit "their health care to such provider." Tenn. Code Ann. §63-3-102(a). The Health Care Consumer Right to Know Act of 1998 requires a surrender of hospital privileges, such as the surrender by Dr. Patel at issue in this case, to be publicly disclosed. Tenn. Code Ann. §63-32-105(a)(4). Such information may also be of importance to a jury in weighing the differing opinions of expert witnesses in a medical negligence case.
>
> Dr. Patel's surrender of privileges in lieu of investigation is not a record of a QIC and it is a fact required to be publicly disclosed by the Health Care Consumer Right to Know Act of 1998. Plaintiff's have obtained this document and information through that public disclosure and not from any QIC member or record. This information is, as plaintiffs correctly point out, "available from [an] original source...;" and, therefore not immune from

discovery or use in a judicial proceeding. Tenn. Code Ann. § 63-1-150 (d)(2).

Assuming the defendant testifies regarding the standard of care, and his compliance therewith, the jury is entitled to consider all relevant information regarding his qualifications and the introduction of the disputed evidence will not be restricted. However, the undersigned will provide the jurors with a limiting instruction in which they will be admonished not to consider this evidence in determining whether Dr. Patel was at fault in this case, but only in evaluating his testimony as an expert and that it may be considered in resolving any discrepancies between the testimony of Dr. Patel and current or former staff of the hospital. The attorneys are invited to file requested versions of this limiting instruction.

The second trial proceeded, with much the same evidence introduced as in the first trial. This time, however, Nurse Crespo testified in Mr. Kanipe's case-in-chief, rather than in rebuttal. Also, this time, evidence of Dr. Patel's voluntary surrender of his privileges to practice at Morristown-Hamblen Hospital was admitted, subject to the following limiting instruction:

There's been evidence, obviously, presented to you about the surrender of hospital privileges by Dr. Patel at the Morristown Hamblen Hospital and that's been admitted only for some limited purposes.

What you may not consider this in connection with is whether or not Dr. Patel was at fault in this case, and this is not this case. This information has been admitted into evidence and you may consider it in evaluating Dr. Patel's qualifications as an expert witness and you may consider the evidence in resolving any discrepancies between the testimony of Dr. Patel and the former hospital employee Nurse Crespo or Nurse Cochran, and those are the limited purposes for which you may consider this.

Dr. Patel took the stand in the second trial and testified succinctly to the impact that the jury believing he had been notified of Ms. Kanipe's pain would have on the case:

Q. Doctor, as you previously admitted, if you had been aware of Ms. Kanipe having chest pain, the standard of care was for you to go back in and reevaluate her. Correct?
A. Correct.
Q. So if the jury believes Nurse [Crespo], you did not comply with the standard of care. Isn't that right?
A. Yes.

Q. If you're aware of the pain spike, the normal troponin, and that she continued to have pain, the standard of care, again, was for you to go in and reevaluate her?

A. Correct.

Q. And if Nurse [Crespo] was honest in her testimony here and the jury credits that, then by your own admission, you violated the standard of care. Correct?

A. Correct.

Following the second trial, the jury found in favor of Mr. Kanipe. The jury awarded $10,000 for Ms. Kanipe's pain and suffering; $9,300 for Ms. Kanipe's funeral expenses; and $300,000 for the pecuniary value of Ms. Kanipe's life. Dr. Patel filed a motion for a new trial, which the Trial Court denied in its June 2019 final order. Dr. Patel timely appealed to this Court.

## Discussion

Although not stated exactly as such, Dr. Patel raises the following issues on appeal: 1) whether the Trial Court erred in granting Mr. Kanipe's motion for a new trial in the first trial; 2) whether the Trial Court erred in admitting evidence of Dr. Patel's voluntary surrender of his privileges to practice medicine at Morristown-Hamblen Hospital in the second trial; and, 3) whether the Trial Court failed to independently exercise its role as thirteenth juror.

We first address whether the Trial Court erred in granting Mr. Kanipe's motion for a new trial in the first trial. We have explained previously our standard of review of a trial court's decision on a motion for a new trial:

> A trial court is given wide latitude in granting a motion for new trial, and a reviewing court will not overturn such a decision unless there has been an abuse of discretion. *Mize v. Skeen*, 63 Tenn. App. 37, 42-43, 468 S.W.2d 733, 736 (1971); *see also Tennessee Asphalt Co. v. Purcell Enter.*, 631 S.W.2d 439, 442 (Tenn. App. 1982). As the thirteenth juror, the trial judge is required to approve or disapprove the verdict, to independently weigh the evidence, and to determine whether the evidence preponderates in favor of or against the jury verdict. *Mize*, 63 Tenn. App. at 42, 468 S.W.2d at 736. If the trial judge is dissatisfied with the verdict, he should set it aside and grant a new trial. *Hatcher v. Dickman*, 700 S.W.2d 898, 899 (Tenn. App. 1985) (quoting *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 469, 79 S.W. 803, 804 (1904)).

*Loeffler v. Kjellgren*, 884 S.W.2d 463, 468-69 (Tenn. Ct. App. 1994). Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

In granting Mr. Kanipe's motion for a new trial, the Trial Court relied on our Supreme Court's holding in *George v. Alexander*. In *George v. Alexander*, our Supreme Court ruled that the defendants, having failed to plead comparative fault, contravened Tenn. R. Civ. P. 8.03[3] by shifting blame to another party at trial. The *George* Court stated, in relevant part:

> The plaintiff argues that because the deposition of Dr. Allen was offered for the sole purpose of shifting the blame for the injuries away from the defendants and onto Dr. Daniell—the surgeon primarily responsible for positioning the patient—Rule 8.03 required the defendants to affirmatively plead Daniell's fault as a defense….
>
> ***
>
> In response, the defendants argue that Rule 8.03 is triggered only when the defendant seeks to show that another person was *legally at fault* for the plaintiff's injuries….
>
> ***
>
> While the defendants' position seems plausible at first blush, its assumption that proof of proximate cause is necessary to "shift the blame" to another is unfounded. Since proximate cause is actually just a policy decision of the judiciary to "deny liability for otherwise actionable causes of harm," *see Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993); Joseph H. King, Jr., *Causation, Valuation and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1355, n. 7 (1981), the defendants' position ignores the fact that "blame-

---

[3] Rule 8.03 provides: "In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute accord and satisfaction, arbitration and award, express assumption of risk, comparative fault (including the identity or description of any other alleged tortfeasors), discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, statute of repose, waiver, workers' compensation immunity, and any other matter constituting an affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation."

shifting" in a negligence context actually has to do with the element of causation in fact. Once the defendant introduces evidence that another person's conduct fits this element, it has effectively shifted the blame to that person. Therefore, if the defendants' position were to be accepted, any defendant wishing to transfer blame to another person at trial could *always* maintain that it is not trying to show that the other's conduct satisfies the legal definition of negligence, but that it is merely trying to establish that the other person's conduct actually caused the injury. In the latter situation, however, the defendant has fully accomplished what Rule 8.03 was intended to prevent: it has effectively shifted the blame to another person without giving the plaintiff notice of its intent to do so. Therefore, the purpose of Rule 8.03 would be undermined to a substantial degree if the defendants' overly technical argument were to prevail.

*George v. Alexander*, 931 S.W.2d 517, 520-21 (Tenn. 1996) (footnote omitted, emphases in original). This Court later observed that "the Supreme Court clearly established that 'Rule 8.03 is a prophylactic rule of procedure that must be strictly adhered to if it is to achieve its purposes.'" *Dickson v. Kriger*, 374 S.W.3d 405, 412-13 (Tenn. Ct. App. 2012) (quoting *George*, 931 S.W.2d at 522).

In his brief, Dr. Patel acknowledges *George* but argues it is inapplicable here. Dr. Patel denies he blamed the nurses. He states that no expert testimony regarding the nursing standard of care, or deviation from that standard of care, was presented on his behalf. Dr. Patel argues that he did not flout *George* simply by answering a factual question on cross-examination. At oral argument, Dr. Patel's attorney argued that even if Dr. Patel had been notified of Ms. Kanipe's ongoing chest pain and went in to re-evaluate her, he would have stuck to his original plan of waiting until the next day to decide on further tests. Per this argument, the phone call was of no causative effect.

In response, Mr. Kanipe argues that Dr. Patel's testimony tended to show that the nursing staff's failure to notify him of Ms. Kanipe's chest pain was the cause in fact of her death. However, Dr. Patel never pled the comparative fault of any nurse. Thus, argues Mr. Kanipe, Dr. Patel's attempt to shift blame to the nurses at trial ran afoul of *George* and warranted a new trial. Mr. Kanipe asserts there is no support for a distinction to be drawn between "factual" testimony and "accusatory" testimony.

In keeping with *George*, our inquiry is with respect to causation in fact. Therefore, whether the nurses adhered to the nursing standard of care is not before us. The issue is whether Dr. Patel cast blame on non-party nurses for causing Ms. Kanipe's death. Dr. Patel testified that he was not trying to blame anybody. However, if a defendant states that

-14-

he is not trying to blame anybody, but then proceeds to blame somebody, the disclaimer that he is not trying to blame anybody rings hollow.

Dr. Barksdale's testimony from the first trial reflects that, with an aortic dissection, time is of the essence, and that either a CT scan or heart catheterization likely would have revealed it in Ms. Kanipe. Dr. Patel's own testimony highlights how impactful it would have been had he known about Ms. Kanipe's ongoing chest pain. Dr. Patel testified such pain is a clinically significant finding. Dr. Patel testified that his being notified of such pain would have led him to re-evaluate Ms. Kanipe, which he never did.

Dr. Patel's argument notwithstanding, we are unpersuaded that the matter of whether he ever was notified about Ms. Kanipe's ongoing chest pain somehow was immaterial to a determination of the cause in fact of her death. The jury in the first trial could well have concluded that non-party nurses were to blame for Ms. Kanipe's death rather than Dr. Patel. Under *George*, it was incumbent upon Dr. Patel to plead the comparative fault of the nurses in his answer if he intended to assert that they never notified him of Ms. Kanipe's ongoing pain, but he failed to do so.

Dr. Patel argues, nevertheless, that Mr. Kanipe opened the door to the issue of notification and should not have been granted a retrial on account of a subject he introduced. Dr. Patel points to the direct examination testimony of Dr. Barksdale, who testified critically about the language used in the order in Ms. Kanipe's chart. Dr. Patel asserts that, in contrast, his own factual testimony regarding notification was elicited only during his cross-examination, and that Mr. Kanipe failed to object or move to strike.

We note first that when Dr. Patel's attorney pursued on Dr. Barksdale's cross-examination the issue of whether Dr. Patel was notified, Mr. Kanipe's attorney timely objected on grounds that comparative fault had not been pled. The objection was overruled; she did not have to object continually to preserve her objection. With respect to Dr. Barksdale's testimony about notification, this did not tend to blame the nurses for Ms. Kanipe's death. If anything, Dr. Barksdale faulted Dr. Patel for not ensuring there was stronger language in the order about calling him if Ms. Kanipe continued to experience chest pain. Mr. Kanipe did not introduce the issue of the nurses' potential fault. Dr. Patel did when he testified point-blank that he never was notified of Ms. Kanipe's pain and would have re-evaluated her had he known of it. In keeping with our Supreme Court's holding in *George v. Alexander*, we discern no abuse of discretion in the Trial Court's decision to grant Mr. Kanipe's motion for a new trial.

We next address whether the Trial Court erred in admitting evidence of Dr. Patel's voluntary surrender of his privileges to practice medicine at Morristown-Hamblen Hospital in the second trial. Dr. Patel argues that admission of this evidence violated peer review

-15-

privilege and lacked any probative value. In response, Mr. Kanipe argues, among other things, that the information falls under the "original source exception."

Regarding evidentiary decisions, "trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). This Court has discussed the original source exception as follows:

> To further protect those who participate in a QIC [quality improvement committee] or provide information or testimony to a QIC, the General Assembly mandated that all records of a QIC, including testimony or statements by persons relating to activities of the QIC, are not only confidential and privileged, they are protected from discovery or admission into evidence. Tenn. Code Ann. § 68-11-272(c)(1)….

> ***

> Nevertheless, the HCQIA provides an exception to the above, known as the "original source" exception. *See* Tenn. Code Ann. § 68-11-272(c)(2). Pursuant to this exception, any information, documents or records that were not produced for use by a QIC, or which were not produced by persons acting on behalf of a QIC, and are available from original sources, are not immune from discovery or admission into evidence even if the information was presented during a QIC proceeding. Tenn. Code Ann. § 68-11-272(c)(2). Furthermore, persons who provided testimony or information to or as part of a QIC are not exempt from discovery and are not prohibited from testifying as to their knowledge of facts or their opinions. *Id*.; *see Powell v. Community Health Systems, Inc.*, 312 S.W.3d 496, 510 (Tenn. 2010); *see also Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d 280, 287 (Tenn. 2007) (Holding that, under the TPRL, information that had been furnished to a peer review committee by original sources "outside the committee" could be obtained directly from the original sources, unless otherwise privileged).

> We find it significant that the original source exception to the HCQIA privilege parallels the work product doctrine in many respects. *See* Tenn. R. Civ. P. 26.02(3); s*ee also* Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 8-1[i] at 8-25 (3d ed. 2009). Like the original source exception, the work product doctrine does not prevent the discovery of facts from the original source of the information. *Id*. § 8-1[i] at 8-26. Thus, while the work product doctrine prohibits a litigant from obtaining from the adverse party its work product, the litigant may obtain substantially the same

-16-

information directly from the original sources. *See id.* § 8-1[i] at 8-28. Although the HCQIA privilege is problematic, it does not prohibit Dr. Pinkard from obtaining evidence that goes to the heart of the case from the original sources.

*Pinkard v. HCA Health Servs. of Tennessee, Inc.*, 545 S.W.3d 443, 452-53 (Tenn. Ct. App. 2017) (footnotes omitted).

Dr. Patel points out correctly that the purpose of peer review privilege is to foster the improvement of healthcare services by protecting the records of QICs from discovery and thereby encouraging frankness in their deliberations. However, the fact of Dr. Patel's surrender of privileges in lieu of an investigation at Morristown-Hamblen Hospital is not, in our judgment, the sort of material the disclosure of which would tend to chill the work of QICs as envisioned by peer review privilege. Mr. Kanipe's attorney found this information on the Tennessee Department of Health website under Dr. Patel's publicly available Practitioner Profile. In addition, the Trial Court instructed the jury that it had to confine its consideration of this evidence to questions of Dr. Patel's competence as an expert witness and his credibility in resolving the factual dispute over the content of the 3:30 p.m. phone call with Nurse Crespo. Evidence of Dr. Patel's surrender of privileges thus was relevant for impeachment purposes. Dr. Patel's later surrender of his privileges at Morristown-Hamblen Hospital was not offered for the purpose of showing that Dr. Patel was negligent in his treatment of Ms. Kanipe. We do not presume without evidence that the jury ignored the Trial Court's limiting instruction. Given this narrowing of what the jury could use the information for, and in view of the original source exception, we find no abuse of discretion in the Trial Court's admission into evidence of Dr. Patel's voluntary surrender of privileges at Morristown-Hamblen Hospital.

The third and final issue we address is whether the Trial Court failed to independently exercise its role as thirteenth juror. Dr. Patel points to a comment the Trial Court made after the first trial: "And, you know, there was plenty of evidence on which to make a finding on behalf of Dr. Patel in the case, so I'm not ruling that it was against the weight of the evidence." Dr. Patel argues:

Upon consideration of the facts and evidence presented during these two trials, it is apparent that the trial court failed to properly exercise its role as thirteenth juror, when, upon hearing the same evidence presented on two separate occasions, determined that the verdict in favor of Dr. Patel after the first trial was supported by the evidence, and then the opposite verdict against Dr. Patel after the second trial, based upon the same evidence, was also supported by the weight of the evidence.

-17-

Regarding a trial court's duty to independently exercise its role as thirteenth juror and the consequences of a trial court's failure to do so, this Court has discussed:

> When a party moving for a new trial asserts that the jury's verdict was contrary to the weight of the evidence, it is the trial judge's duty to independently weigh the evidence to determine whether it preponderates against the verdict and, if so, to grant a new trial. *Jones v. Tenn. Farmers Mut. Ins. Co.*, 896 S.W.2d 553, 556 (Tenn. Ct. App. 1994). Like the jury, the trial judge is not bound to give any reasons for its decision to grant or deny a new trial based on the preponderance of the evidence. *Cooper v. Tabb*, 347 S.W.3d 207, 221 (Tenn. Ct. App. 2010). When the trial judge approves the verdict without comment, the appellate court will presume that the trial judge adequately performed his or her function as the thirteenth juror. *Id.* However, a statement indicating that the trial judge has misconceived his or her duty is grounds for reversal on appeal. *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996).

*In re Estate of Link*, 542 S.W.3d 438, 467 (Tenn. Ct. App. 2017).

With respect to the Trial Court's comment cited by Dr. Patel, we disagree that it reflects deference to the jury. Rather, it is the Trial Court's assessment of the preponderance of the evidence. Dr. Patel's larger point appears to be that, because the Trial Court heard evidence in two consecutive trials of the same matter with largely the same evidence presented, yet reached different conclusions each time with both conclusions aligning with the respective juries' conclusions, the Trial Court *ipso facto* displayed a lack of independence. We find no basis for this would-be rule. While the trials were similar, they were not identical. For example, in the second trial, Nurse Crespo testified in Mr. Kanipe's case in chief instead of in rebuttal. It is just as conceivable that the Trial Court found Mr. Kanipe's case more compelling in the second trial than it did the first as it is that the Trial Court improperly deferred to the jury. At no point did the Trial Court state, or hint, that it deferred to the jury. We find no evidence that the Trial Court failed to independently exercise its role as thirteenth juror. We affirm.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Pragnesh Patel, M.D., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE