IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 5, 2024 Session

## PAYTON CASTILLO v. DAVID LLOYD REX, M.D. ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Hamilton County**
No. 20C1270     Ward Jeffrey Hollingsworth, Judge

———————————————————

**No. E2022-00322-SC-R11-CV**

———————————————————

In this appeal, we examine the privilege provided under Tennessee Code Annotated section 68-11-272, commonly referred to as the quality improvement committee or "QIC" privilege, and its application. Plaintiff filed this healthcare liability action asserting that CHI Memorial Hospital and other entities and physicians were negligent in providing care for her husband, who passed away shortly after being discharged from the hospital's emergency room. Defendants sought a protective order based on the QIC privilege to prohibit inquiry into a meeting held by the hospital and the decedent's family. The trial court denied Defendants' motion. On interlocutory review, the Court of Appeals affirmed, finding that statements made in the meeting were not protected by the QIC privilege. Defendants appealed, arguing that the information sought related to QIC activities and therefore was privileged from direct or indirect discovery. We hold the QIC privilege applied to statements made during the meeting that were based on information obtained during the QIC process, but Memorial waived the privilege when hospital management voluntarily disclosed that privileged information.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed on Separate Grounds; Remanded to the Trial Court**

DWIGHT E. TARWATER, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., JEFFREY S. BIVINS, SARAH K. CAMPBELL, and MARY WAGNER, JJ., joined.

Cara E. Weiner and Christopher R. Ramsey, Chattanooga, Tennessee, for the appellants Memorial Health Care System, Inc. and Memorial Health Care System, Inc. d/b/a/ CHI Memorial.

H. Dean Clements and Brie Allaman Stewart, Chattanooga, Tennessee, for the appellants, Thomas R. Rimer and Diagnostic Imaging Consultants, P.C.

J. Eric Miles and Brigham A. Dixson, Nashville, Tennessee, for the appellants, Virtual Radiologic Services, LLC, David Lloyd Rex, Virtual Radiologic Corporation, Virtual Radiologic Professionals, LLC, and Virtual Radiologic Professionals of Minnesota, P.A.

Alix C. Michel and David J. Ward, Chattanooga, Tennessee, for the appellee, Payton Castillo.

Raymond Grant Lewallen, Jr., Knoxville, Tennessee, for the Amicus Curiae, Tennessee Defense Lawyers Association.

Craig P. Sanders and Ashley D. Cleek, Jackson, Tennessee, for the Amicus Curiae, Tennessee Hospital Association.

W. Bryan Smith, Memphis, Tennessee, and Brian G. Brooks, Greenbrier, Arkansas, for the Amicus Curiae, Tennessee Trial Lawyers Association.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

In the early morning hours of January 3, 2020, Marshal Castillo arrived with his wife Payton Castillo at CHI Memorial Hospital's ("Memorial") emergency room experiencing severe abdominal pain.[1] The physicians ordered a CT scan and ultrasound. The CT scan was interpreted by Dr. David Lloyd Rex, who was employed by Virtual Radiologic Professionals, LLC ("VRP"), and the ultrasound was interpreted by Dr. Thomas Rimer, a physician employed by Diagnostic Imaging Consultants, P.C. ("Diagnostic"). Both Dr. Rex and Dr. Rimer concluded the respective scans were unremarkable. Based upon those conclusions, the treating physicians discharged Mr. Castillo from the hospital around ten in the morning. Mr. and Mrs. Castillo went home with instructions for Mr. Castillo to drink fluids and eat plenty of fiber. A few hours later, Mrs. Castillo found her husband on the floor of their bathroom unconscious and called for an ambulance that returned Mr. Castillo to Memorial. Mr. Castillo passed away shortly thereafter. It was later revealed that he had suffered an internal hemorrhage.

Following Mr. Castillo's death, Memorial convened an internal quality improvement committee ("QIC") to review the care and treatment rendered to Mr. Castillo. After the QIC review, Anthony Houston, Chief Operating Officer of Memorial, invited Mrs. Castillo to the hospital to conduct what he later described as a "Communication and

---

[1] Because this appeal arises from a discovery dispute, our recitation of facts is derived principally from the allegations in the complaint.

Optimal Resolution" meeting, otherwise known as a CANDOR meeting.[2] Present at the meeting on behalf of Memorial were Mr. Houston, Dr. Matthew Kodsi, Vice President of Medical Affairs, and Ms. Jessica Stanley, Director of Quality. Mrs. Castillo was accompanied by her parents.

Mrs. Castillo was not informed of the purpose of the meeting beforehand, did not sign any documents at the meeting, and was not told that the information being shared with her was confidential or privileged in any way. During the meeting, Mr. Houston expressed his condolences and told Mrs. Castillo the CT scan revealed an internal bleed and her husband should not have been discharged from the hospital.

On December 28, 2020, Mrs. Castillo filed this healthcare liability action in Hamilton County Circuit Court, naming as defendants Memorial and the other entities and physicians[3] responsible for her husband's care. As the case proceeded to discovery, Mrs. Castillo was deposed by counsel for Memorial, who questioned her about the CANDOR meeting. Memorial's counsel made repeated and detailed inquiries into the statements by Mr. Houston to Mrs. Castillo regarding the quality of care Mr. Castillo received at Memorial.

Soon after, Plaintiff's counsel deposed Dr. Kodsi and Ms. Stanley and questioned both about what was discussed at the CANDOR meeting and any statements made to Mrs. Castillo regarding her husband's care. Despite affirmatively eliciting the same information during Mrs. Castillo's deposition, counsel for Memorial objected and advised the witnesses not to answer on the basis that the information sought was privileged under the QIC privilege, which is a form of peer review privilege codified at Tennessee Code Annotated section 68-11-272. In addition to the deposition testimony, Mrs. Castillo also sought any and all documents used in preparation for the CANDOR meeting in her second request for production of documents. Memorial moved for a protective order under Tennessee Rule of Civil Procedure 26.03, arguing that inquiry into the nature and contents of certain statements made at the CANDOR meeting should be prohibited because those statements made to Mrs. Castillo and her parents are protected under the QIC privilege. In support, Memorial filed Dr. Kodsi's affidavit, which stated "[a]ny discussion during the CANDOR meeting of the quality or appropriateness of the healthcare rendered or not rendered to Mr. Castillo was based on the QIC [r]eviews."

---

[2] CANDOR is a term of art used to describe meetings conducted pursuant to a CANDOR statute. *See* Colo. Rev. Stat. Ann. § 25-51-103 (West 2024); Iowa Code Ann. § 135P.1 (West 2024); Minn. Stat. § 145.685 (West 2024); Utah Code Ann. § 78B-3-451 (West 2024). Tennessee does not have a CANDOR statute, but we will refer to the meeting as the parties do.

[3] These other entities and physicians include Dr. Rex, Dr. Rimer, Virtual Radiologic Corporation, Virtual Radiologic Professionals of Minnesota, P.A., VRP, Virtual Radiologic Services, LLC, and Diagnostic.

The trial court granted in part and denied in part Memorial's motion for a protective order. The trial court agreed that the QIC proceeding is privileged but found that "statements made in a CANDOR meeting are not privileged simply because those statements are based on information obtained in the QIC proceeding." "CANDOR meetings are separate from the QIC proceedings and there is no privilege attached to statements made in CANDOR meetings."

Defendants separately moved for permission to file an interlocutory appeal, which the trial court granted. The Court of Appeals granted Defendants' motions and consolidated the appeals for review. *Castillo v. Rex*, No. E2022-00322-COA-R9-CV, 2023 WL 6464103, at *1 (Tenn. Ct. App. Oct. 4, 2023), *perm. app. granted*, (Tenn. Mar. 14, 2024). Two questions were certified for review:

> (1)     Whether statements made by representatives of Defendant [] Memorial in a CANDOR meeting, which are based on information obtained in a QIC proceeding, are privileged under [Tennessee Code Annotated section] 68-11-272.
> (2)     Whether testimony from representatives of Defendant [] Memorial regarding statements made in a CANDOR meeting, which are based on information obtained in a QIC proceeding, constitutes "direct or indirect discovery" as prohibited by [Tennessee Code Annotated section] 68-11-272.

The Court of Appeals affirmed on both issues, noting that "[t]he privilege simply does not apply to statements made at the CANDOR meeting whether or not such statements were based upon information obtained from a QIC proceeding." *Id.* at *4. Focusing on the competing purposes of the QIC privilege and CANDOR meetings, the appellate court found that "[t]he statements made at the CANDOR meeting were not designed to 'evaluate the safety, quality, processes, costs, appropriateness or necessity of healthcare services'" and, therefore, the QIC privilege does not apply. *Id.* (quoting Tenn. Code Ann. § 68-11-272(b)(4) (2024)).

Defendants applied for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure raising the same issues. We granted permission to appeal.

## II.     STANDARD OF REVIEW

We use the abuse of discretion standard to review discovery determinations. *Funk v. Scripps Media, Inc.*, 570 S.W.3d 205, 210 (Tenn. 2019) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). A court abuses its discretion by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med.*, 312 S.W.3d at

524 (citing *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Doe 1 ex rel. Doe 1 v. Roman Cath. Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 2005)). Thus, we review discretionary decisions by deciding "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Id.* (citing *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872–73 (Tenn. Ct. App. 2008)).

The factual findings of the lower court are afforded a presumption of correctness, unless the evidence preponderates against it. Tenn. R. App. P. 13(d); *see Lee Med.*, 312 S.W.3d at 524; *Dialysis Clinic, Inc. v. Medley*, 567 S.W.3d 314, 318 (Tenn. 2019) (citing *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002)). Any legal determinations and statutory interpretation matters are reviewed de novo, including the interpretation and application of a statutory privilege. *Lee Med.*, 312 S.W.3d at 525; *Yebuah v. Ctr. for Urological Treatment, PLC*, 624 S.W.3d 481, 485 (Tenn. 2021).

### III.   ANALYSIS

We begin our analysis by discussing the evolution of the peer review privilege in Tennessee. Next, we provide a general overview of CANDOR meetings and how, if at all, they impact the case before us. We then analyze the applicability of the QIC privilege provided under the Patient Safety and Quality Improvement Act in this case. Finally, we address whether the QIC privilege may be waived.

### *Peer Review Privilege*

"Medical peer review has become the principal method of evaluating the quality of patient care." *Rechsteiner v. Hazelden*, 753 N.W.2d 496, 505 (Wis. 2008); *see also* Lisa M. Nijm, *Pitfalls of Peer Review: The Limited Protections of State and Federal Peer Review Law for Physicians*, 24 J. Legal Med. 541, 541 (2003) ("Peer review serves as one of medicine's most effective risk management and quality improvement tools."). To encourage candid evaluation of patient care, many states, including Tennessee, have granted peer review committees certain protections. *See* Tenn. Code Ann. § 68-11-272; *Lee Med.*, 312 S.W.3d at 530–31; *Stratienko v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 226 S.W.3d 280, 283 (Tenn. 2007) ("The confidentiality of peer review proceedings is essential to this process."); Dorothy Duffy & Martha C. Romney, *Medicine and Law: Recent Developments in Peer Review and Informed Consent*, 26 Tort & Ins. L.J. 331, 334 & n.25 (1991) (discussing peer review privilege in different states).

Tennessee has long recognized an evidentiary privilege among participants of a peer review proceeding. *See* Act of May 26, 1967, ch. 348, § 1, 1967 Tenn. Pub. Acts 1066 (codified at Tenn. Code Ann. § 63-6-219) (repealed 2011). The Tennessee Peer Review Law ("TPRL") was codified in 1967 with the purpose "to encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously and objectively evaluate and review their peers' professional conduct, competence and ability to practice medicine." Tenn. Code Ann. § 63-6-219(b)(1) (2010). The TPRL privilege was broad, providing that "[a]ll information . . . and any findings, conclusions or recommendations resulting from the proceedings of such [peer review] committee are declared to be privileged. All such information, in any form whatsoever, so furnished to, or generated by, a medical peer review committee, shall be privileged." *Id.* § 63-6-219(e); *see also Eyring v. Fort Sanders Parkwest Med. Ctr.*, 991 S.W.2d 230, 239 (Tenn. 1999) ("This statute creates a broad privilege . . . ."). The privilege applied to proceedings wherein physicians would "evaluate and review their peers' professional conduct, competence and ability to practice medicine" and any records that arose from such a proceeding. Tenn. Code Ann. § 63-6-219(b)(1); *Lee Med.*, 312 S.W.3d at 531, 536–37; *see Gautreaux v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. E2009-00367-COA-R3-CV, 2010 WL 2593613, at *5 (Tenn. Ct. App. June 29, 2010) (finding because an agreement "stemmed from peer review action," it was privileged under the TPRL), *perm app. denied*, (Tenn. Nov. 16, 2010).

In 2010, this Court reviewed the TPRL to determine if a hospital waived its right to assert this peer review privilege in *Powell v. Community Health Systems, Inc.*, 312 S.W.3d 496, 503 (Tenn. 2010). A former employee brought an action against a hospital where she sought to depose the hospital's infectious control director who worked with a peer review committee. *Id.* at 501–02. The hospital argued her testimony was privileged under the TPRL, while the former employee claimed the privilege was waived. *Id.* at 511. Because the TPRL did not contain an express waiver provision, the Court reasoned "[i]n the absence of a statute to the contrary, only the person entitled to the benefit of a privilege may waive the privilege." *Id.* at 512. The Court concluded that "[t]he peer review privilege is intended to benefit the entire peer review process, not simply the individuals participating in the process," and held that the privilege was not waivable. *Id.* at 513. The Court deferred to the General Assembly "to determine if and under what circumstances the privilege may be waived." *Id.*

Shortly thereafter, the General Assembly passed the Patient Safety and Quality Improvement Act of 2011 (the "PSQIA"), replacing the TPRL. Patient Safety and Quality Improvement Act of 2011, ch. 67, §§ 1–6, 2011 Tenn. Pub. Acts, https://publications. tnsosfiles.com/acts/107/pub/pc0067.pdf (codified at Tenn. Code Ann. § 68-11-272). Similar to the TPRL, the stated purpose of the PSQIA is "to encourage the improvement of patient safety, the quality of patient care and the evaluation of the quality, safety, cost, processes and necessity of healthcare services by hospitals, healthcare facilities and healthcare providers." Tenn. Code Ann. § 68-11-272(a). The new law allows a healthcare

organization to create a quality improvement committee or "QIC" to evaluate the quality of care provided by that healthcare organization. *Id.* § 68-11-272(b)(4). The statute also contains a similar statutory privilege:

> Records of a QIC and testimony or statements by a healthcare organization's officers, directors, trustees, healthcare providers, administrative staff, employees or other committee members or attendees *relating to activities of the QIC shall be confidential and privileged* and shall be protected from direct or indirect means of discovery, subpoena or admission into evidence in any judicial or administrative proceeding.

*Id.* § 68-11-272(c)(1) (emphasis added).

The Court of Appeals subsequently addressed the PSQIA privilege in *Pinkard v. HCA Health Services* and was confronted with the same waiver issue addressed by *Powell*. 545 S.W.3d 443, 454 (Tenn. Ct. App. 2017), *perm. app. denied*, (Tenn. Nov. 16, 2017); *see Powell*, 312 S.W.3d at 512–13. *Pinkard* involved a dispute between a healthcare organization and a physician after the physician's staff privileges were revoked. *Pinkard*, 545 S.W.3d at 446. The physician claimed the healthcare organization acted in bad faith and with malice during a QIC proceeding. *Id.* The physician argued that because the healthcare organization had already submitted a transcript and other records from the proceeding in support of its summary judgment motion, it had waived the privilege. *Id.* at 449, 454. Relying on *Powell*'s interpretation of the TPRL, the court found that under the PSQIA, "the beneficiaries of the statutory privilege are all who participate in or provide information to a QIC." *Id.* at 457. The court concluded that because the healthcare organization was simply one of the beneficiaries of the privilege and not the holder of the privilege, the healthcare organization could not waive the privilege:

> Based on the reasoning in *Powell* and the substantial similarities in the two statutory schemes, we have concluded that no individual is the holder of the [QIC] privilege and that the [QIC] privilege cannot be waived. The fact that the privilege cannot be waived is problematic; nevertheless, we may not take the peer review privilege lightly "because weakening this privilege could undermine the confidentiality that the privilege is intended to protect." In this case, no person is the holder of the privilege and the [QIC] statutory scheme does not expressly authorize the waiving of the privilege. Therefore, we affirm the trial court's ruling that the privilege cannot be waived.

*Id.* at 457–58 (quoting *Powell*, 312 S.W.3d at 512) (citation omitted).

*CANDOR*

This case is unique as the purportedly privileged information was directly disclosed to the plaintiff during a "CANDOR" meeting by hospital management. According to the Agency for Healthcare Research and Quality, CANDOR stands for Communication and Optimal Resolution, and "is a process that health care institutions and practitioners can use to respond in a timely, thorough, and just way when unexpected events cause patient harm." *Communication and Optimal Resolution*, Agency for Healthcare Rsch. & Quality, https ://www.ahrq.gov/patient-safety/settings/hospital/candor/index.html (last visited Apr. 24, 2025). "[A] CANDOR meeting is held with the patient or the family following an adverse healthcare event to provide information concerning the details of the care provided and to facilitate an optimal resolution." *Castillo*, 2023 WL 6464103, at *4. The goals of a CANDOR meeting are to "to demonstrate respect for the patients, families, and caregivers impacted by harm and to address many of the quality and safety priorities identified by health care organizations." *Module 1: An Overview of the CANDOR Process AHRQ Communication and Optimal Resolution Toolkit*, Agency for Healthcare Rsch. & Quality, https://www.ahrq.gov/patient-safety/settings/hospital/candor/modules/notes1.html (last visited Apr. 24, 2025) [hereinafter "AHRQ Toolkit"]; *see* Colo. Rev. Stat. Ann. § 25-51-103(4); Iowa Code Ann. § 135P.3(3); Minn. Stat. § 145.685.2(e); Utah Code Ann. § 78B-3-451.

Only four states have enacted CANDOR statutes: Colorado, Iowa, Minnesota, and Utah. *See* Colo. Rev. Stat. Ann. § 25-51-103; Iowa Code Ann. § 135P.1; Minn. Stat. § 145.685; Utah Code Ann. § 78B-3-453. In all four states, CANDOR meetings are confidential and privileged, and all participating parties are required to receive notice they are participating in a CANDOR meeting. *See* Colo. Rev. Stat. Ann. § 25-51-103(2)(e); Iowa Code Ann. § 135P.2; Minn. Stat. § 145.685.3(a); Utah Code Ann. § 78B-3-454. This notice must include language explaining that (1) the adversely affected party can release their medical records to any third party, (2) the adversely affected party has a right to a lawyer, (3) any applicable legal remedies that may be available, (4) the discussion is privileged, and (5) the statute of limitations will not be extended by engaging in an open discussion. *See* Colo. Rev. Stat. Ann. § 25-51-103(2) (also requiring a copy of the pre-suit notice statute); Iowa Code Ann. § 135P.3(1); Minn. Stat. § 145.685.2; Utah Code Ann. § 78B-3-452. In addition, the adversely affected party must agree in writing to engage in the CANDOR meeting. *See* Colo. Rev. Stat. Ann. § 25-51-103(3)(a); Iowa Code Ann. § 135P.3(2); Minn. Stat. § 145.685.2(c); Utah Code Ann. § 78B-3-452(3).

Notably, Tennessee has no analogous statute to govern these types of meetings. While the record does not establish that Memorial used set standards, procedures, or guidelines during its CANDOR meetings, Ms. Stanley testified that Memorial used the AHRQ Toolkit as a resource in conducting CANDOR meetings. This toolkit describes an intent "to demonstrate respect for the patients, families, and caregivers impacted by harm

and to address many of the quality and safety priorities identified by health care organizations." AHRQ Toolkit, *supra*; *see* Colo. Rev. Stat. Ann. § 25-51-103(4); Iowa Code Ann. § 135P.3(3); Minn. Stat. § 145.685.2(e); Utah Code Ann. § 78B-3-451.

While the parties have labeled this meeting as a CANDOR meeting, this label does not control our analysis. Tennessee does not recognize any additional protections afforded to the purported CANDOR process. We will refer to this meeting as a CANDOR meeting for consistency, but we decline to superimpose the law of another state to the facts at issue here. In this pseudo-CANDOR context, we cannot presume this meeting was confidential or privileged without an applicable statute or agreement to that effect.

*Applicability of the QIC Privilege*

This Court's analysis of a privilege is guided by three legal principles. *Lee Med.*, 312 S.W.3d at 525. First, Tennessee rules of discovery and evidence favor the discoverability of all relevant, non-privileged information in the search for truth. *Id.* Second, "privileges present obstacles to the search for the truth. . . . [and] protect interests and relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some sacrifice of the availability of evidence relevant to the administration of justice." *Id.* (internal quotation marks and citations omitted) (quoting 1 McCormick on Evidence § 72, at 339 (Kenneth S. Broun, ed., 6th ed. 2006)). And third, statutory privileges are to be strictly construed according to their plain language. *Id.* at 525–26.

Considering these principles, we must first determine if the privilege under Tennessee Code Annotated section 68-11-272 applies to the statements made during the meeting Memorial had with Mrs. Castillo. *See Powell*, 312 S.W.3d at 504 (citing *Lee Med.*, 312 S.W.3d at 526). "Decisions regarding the application of the privilege must take into account: (1) the subject matter of the proceeding, (2) the nature and source of the particular record being sought, and (3) the person or entity from whom the record is being sought." *Lee Med.*, 312 S.W.3d at 529–30. In making these decisions, "courts must always begin with the words that the General Assembly has chosen." *Id.* at 526 (citing *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 176 (Tenn. 2008)). We give these words their natural and ordinary meaning "in the context in which they appear in the statute and in light of the statute's general purpose." *Id.* at 526.

We begin with the statute:

Records of a QIC and testimony or statements by a healthcare organization's officers, directors, trustees, healthcare providers, administrative staff, employees or other committee members or attendees *relating to activities of the QIC shall be confidential and privileged* and shall be protected from direct or indirect means of discovery, subpoena or admission into evidence

in any judicial or administrative proceeding. Any person who supplies information, testifies or makes statements as part of a QIC may not be required to provide information as to the information, testimony or statements provided to or made before such a committee or opinions formed by such person as a result of committee participation.

Tenn. Code Ann. § 68-11-272(c)(1) (emphasis added). "[R]elating to activities of the QIC" is broad. *Id.* § 68-11-272(c)(1); *see also Cordell v. Cleveland Tenn. Hosp., LLC*, 544 S.W.3d 331, 338 (Tenn. Ct. App. 2017) ("No doubt, 'related to' and other similar phrases carry a broad meaning."). "In its natural and ordinary usage, the phrase 'related to' simply means connected to in some way." *Lacy v. Vanderbilt Univ. Med. Ctr.*, No. M2016-02014-COA-R3-CV, 2017 WL 6273316, at *6 (Tenn. Ct. App. May 4, 2017) (citing *Related*, *Black's Law Dictionary* 1479 (10th ed. 2014)); *see also Cordell*, 544 S.W.3d at 338 ("Indeed, to relate to something is to bring into association with or connection with." (internal quotation marks and citation omitted)); *Relate to*, Merriam-Webster, https://www .merriam-webster.com/dictionary/relate%20to ("to be connected with (someone or something); to be about (someone or something)"). Under the plain language of section 68-11-272(c)(1), testimony and statements are privileged if they are "connected to" the activities of the QIC.[4] *Lacy*, 2017 WL 6273316, at *6. Mrs. Castillo seeks to discover statements made to her by the chief operating officer of Memorial during their meeting, arguing that the QIC privilege does not apply in this setting and, even if it did, the statements are still discoverable because they are not sufficiently related to the activities of the QIC.

We must first determine whether the statements at the meeting arose from the QIC proceeding. *See Lee Med.*, 312 S.W.3d at 536. The record unequivocally establishes that "[a]ny discussion during the CANDOR meeting of the quality or appropriateness of the healthcare rendered or not rendered to Mr. Castillo was based on the QIC [r]eviews." Dr. Kodsi stated exactly that in his affidavit. We find that the statements made to Mrs. Castillo "arose from" the QIC. *See id.* Because these statements originated or "stemmed from" the QIC, they are "related to the activities of the QIC." *See* Tenn. Code Ann. § 68-11-272(c)(1); *Gautreaux*, 2010 WL 2593613, at *5. Therefore, the privilege applies.

Mrs. Castillo contends that statements made during a CANDOR meeting "should not be afforded the privilege contained in [section] 68-11-272(c)(1)" because CANDOR meetings serve a different purpose than QIC proceedings. We are not persuaded by this argument. In fact, the purpose of a CANDOR meeting and QIC proceedings might be more complementary than contradictory, both encouraging an open dialogue of patient care.

---

[4] Subsection (c)(2) provides an original source exception that excludes "[a]ny information, documents or records, which are not produced for use by a QIC or . . . by persons acting on behalf of a QIC, and are otherwise available from original sources." Tenn. Code Ann. § 68-11-272(c)(2).

- 10 -

*Compare* Tenn. Code Ann. § 68-11-272(a) (encouraging "the improvement of patient safety" and "the quality of patient care"), *with* AHRQ Toolkit, *supra* (describing one of the purposes of a CANDOR meeting is "to address many of the quality and safety priorities identified by health care organizations"). We do not doubt the purported purpose of the CANDOR meeting. But the statutory language does not limit the privilege's applicability to only QIC proceedings or proceedings with a similar purpose. *See* Tenn. Code Ann. § 68-11-272(c)(1). The privilege attaches to "statements by a healthcare organization's officers . . . relating to activities of the QIC" regardless of where or in what context the statements are made. *Id.*; *see Lee Med.*, 312 S.W.3d at 536 (emphasizing the key determination rests on "whether the records sought to be discovered arose from a peer review proceeding to which the privilege applies").

Mrs. Castillo and the Court of Appeals mainly rely on *Reynolds v. Gray Medical Investors, LLC.* for the proposition that the QIC privilege does not apply to the statements because they were made at the CANDOR meeting. 578 S.W.3d 918, 923 (Tenn. Ct. App. 2018); *Castillo*, 2023 WL 6464103, at *3–4 (citing to the stated purpose of the Colorado CANDOR Act). The issue before the court in *Reynolds* was whether a healthcare provider can use the QIC privilege to protect statements concerning an alleged attempt to coerce perjury or commit a fraud simply because such statements were made during a QIC meeting. *Reynolds*, 578 S.W.3d at 920. Relying on the purpose of the statute, the court accurately concluded that the QIC privilege is not intended to allow "healthcare providers to threaten or coerce employees so as to suborn perjury or commit fraud."[5] *Id.* at 923. Clearly, protecting those statements would be "directly contrary to the purpose of Tenn. Code Ann. § 68-11-272." *Id.* We find the "unusual and limited" facts of *Reynolds* distinguishable from the facts before us. *Id.* In this case, there are no allegations of fraud, and the information sought directly relates to the quality of care provided to Mr. Castillo. The privilege's application to these statements does not directly contradict the statute's purpose but, rather, furthers it. *See* Tenn. Code Ann. § 68-11-272(a); c*f. Reynolds*, 578 S.W.3d at 920 (finding it would be "directly contrary" to the QIC statute to protect fraudulent statements).

Mrs. Castillo also argues that because section 68-11-272 does not specifically reference CANDOR meetings, the privilege cannot apply. We disagree. It would be illogical to assume the General Assembly intended to exempt CANDOR meetings from QIC protections when Tennessee law does not even recognize CANDOR meetings at all. The fact that Memorial refers to these meetings by a certain name that other states recognize by statute does not entitle them to special treatment under Tennessee law. *See*

---

[5] Similarly, there is an exception to the attorney-client privilege allowing an attorney to reveal information to prevent the client from committing a crime or fraud that will lead to a reasonably certain injury. Tenn. Sup. Ct. R. 8, RPC 1.6(b), (c).

Colo. Rev. Stat. Ann. § 25-51-103(4); Iowa Code Ann. § 135P.3(3); Minn. Stat. § 145.685.2(e); Utah Code Ann. § 78B-3-451.

Next, Mrs. Castillo contends that the privilege does not apply because the participants of the CANDOR meeting did not personally participate in the QIC review and are therefore not the persons protected by the statute. Mrs. Castillo asks us to constrain our interpretation of the first sentence of subsection (c)(1) through the lens of the second sentence, which specifies "[a]ny person who supplies information, testifies or makes statements as part of a QIC may not be required to provide information as to the information, testimony or statements provided to or made before such a committee or opinions formed by such person as a result of committee participation." Tenn. Code Ann. § 68-11-272(c)(1). We decline to do so.

The second sentence provides an additional protection that is not a substitute for the protections afforded in the preceding sentence, protecting more broadly "[r]ecords of a QIC and testimony or statements by a healthcare organization's officers . . . relating to activities of the QIC[.]" Tenn. Code Ann. § 68-11-272(c)(1). Mrs. Castillo seeks discovery about statements made by Memorial's chief operating officer, acting in his official capacity, during a meeting requested and convened by Memorial. This scenario is specifically provided for in Tennessee Code Annotated section 68-11-272(c)(1). Mr. Houston is an officer of the healthcare organization. His statements must simply relate to the activities of a QIC to be privileged. Tenn. Code Ann. § 68-11-272(c)(1).

The statements based on the conclusions of the QIC made by hospital management during the CANDOR meeting relate to the activities of the QIC and are privileged. This information is ordinarily "protected from direct or indirect means of discovery, subpoena or admission into evidence in any judicial or administrative proceeding." *Id.* But such information can still be subject to discovery and admission into evidence if the privilege is subject to waiver and is waived. *Cf. State v. Buford*, 216 S.W.3d 323, 326 (Tenn. 2007); *State v. Thompson*, 768 S.W.2d 239, 249 (Tenn. 1989); *Culbertson v. Culbertson*, 455 S.W.3d 107, 150 (Tenn. Ct. App. 2014).

*Waiver*

"Our waiver analysis must begin with the statute itself." *Powell*, 312 S.W.3d at 512. The plain and ordinary meaning of the text guides our analysis. *Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018) ("[W]e first must look to the text of the statute and give the words of the statute 'their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose.'" (quoting *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012))). "We consider the whole text of a statute and interpret each word 'so that no part will be inoperative, superfluous, void or insignificant.'" *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022) (quoting *Bailey v. Blount Cnty. Bd. of Educ.*,

303 S.W.3d 216, 228 (Tenn. 2010)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167–69 (2012) (discussing the "whole text canon").

Like its predecessor, the PSQIA does not contain an express waiver provision stating that the QIC privilege may be waived. *See* Tenn. Code Ann. § 68-11-272; Tenn. Code Ann. § 63-6-219 (2010). Defendants contend this omission and the mandatory language in section 68-11-272(c)(1) ("Records of a QIC and testimony or statements . . . shall be confidential and privileged and shall be protected from direct or indirect means of discovery . . . .") indicate that the QIC privilege is unwaivable. However, it has long been the case under general common-law principles of waiver that the holder of a right or privilege—even one phrased in mandatory language—may waive the right:

> The doctrine of waiver, from its nature, is applicable, generally speaking, to all rights or privileges to which a person is legally entitled, whether secured by contract[,] conferred by statute, or guaranteed by the constitution, provided such rights or privileges rest in the individual, and are intended for his sole benefit. A right or privilege given by statute may be waived or surrendered, in whole or in part, by the party to whom or for whose benefit it is given, if he does not thereby destroy the rights and benefits conferred upon or flowing to another in or from said statute or other legal or equitable source. Even when a statute in so many words declares a transaction void for want of certain forms, the party for whose protection the requirement is made often may waive it, void being held to mean only voidable at the party's choice. A waiver is not, however, allowed to be operative where it would infringe upon the rights of others, or would be against public policy or morals. Where the object of a law is the good of the public as well as of the individual, such protection to the state cannot, at will, be waived by any individual, an integral part thereof. The fact that the individual is willing to waive his protection cannot avail. The public good is entitled to protection and consideration; and if, in order to effectuate the object, there must be enforced protection to the individual, such individual must submit to such enforced protection for the public good.

*Black Diamond Coal Mining Co. v. Rankin*, 98 S.W.2d 311, 312 (Tenn. 1936) (quoting 27 R.C.L. 906–07, para. 3).

We will not depart from these principles in our analysis of this statutory privilege. Without an express waiver provision, we must determine who holds the privilege as "only the person entitled to the benefit of a privilege may waive the privilege." *Powell*, 312 S.W.3d at 512; *see also Smith Cnty. Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 333 (Tenn. 1984); *Black Diamond*, 98 S.W.2d at 312; *Boyd*, 88 S.W.3d at 213. We do not find the holder of the QIC privilege to be so amorphous as precedent suggests. *See Pinkard*, 545

S.W.3d at 455. Unlike its predecessor, the PSQIA identifies the healthcare organization as the entity who forms or retains the QIC:

> "Quality improvement committee" or "QIC" means a committee formed or retained *by a healthcare organization*, an activity *of a healthcare organization*, or one (1) or more individuals employed *by a healthcare organization* performing the types of functions listed in subdivisions (4)(A)–(P) [defining healthcare organization], the purpose of which, or one (1) of the purposes of which is to evaluate the safety, quality, processes, costs, appropriateness or necessity of healthcare services . . . .

Tenn. Code Ann. § 68-11-272(b)(4) (emphasis added); *see* Tenn. Code Ann. § 63-9-219(c) (2010).

The QIC is created by and for a healthcare organization. It logically follows that a healthcare organization is entitled to any benefit afforded to a QIC, including the statutory privilege. *Cf. Powell*, 312 S.W.3d at 512 ("[O]nly the person entitled to the benefit of a privilege may waive the privilege."). Just as a client retains an attorney, a healthcare organization forms or retains a QIC. As the attorney-client privilege "belongs to the client," *Smith Cnty. Educ. Ass'n*, 676 S.W.2d at 333, the QIC privilege belongs to the healthcare organization. The healthcare organization, as defined by the statute, therefore holds the privilege.

We decline to follow *Pinkard*'s analysis of the PSQIA. The court in *Pinkard* based its decision on "the reasoning in *Powell* and the substantial similarities in the two statutory schemes," and failed to acknowledge the fundamental differences in the statutory language. *Pinkard*, 545 S.W.3d at 457 (discussing the six similarities between the statutes). Not only do we find the differences in statutory language enlightening, we do not agree with the notion that a process, as opposed to a person or entity, may hold a privilege. Thus, we overrule *Pinkard* to the extent it held that the QIC process holds the privilege and therefore the privilege is unwaivable.[6]

Notably, other provisions of section 68-11-272 support this conclusion. The first provision of section 68-11-272 states that "Tennessee further recognizes that certain protections must be available *to these entities* [hospitals, healthcare facilities and healthcare providers] to ensure that they are able to effectively pursue these measures." Tenn. Code Ann. § 68-11-272(a) (emphasis added). Additionally, subsection (c)(3) reads "[t]he QIC *and its sponsoring healthcare organization* shall not be held liable and are immune from suit for any disclosure or sharing of information in compliance with this section." *Id.* § 68-

---

[6] We need not overrule *Powell* given it addressed a different statutory scheme. *See Powell*, 312 S.W.3d at 512.

- 14 -

11-272(c)(3) (emphasis added). Subsection (c)(3) also seems to contemplate that the privilege may be waived in some circumstances: "Information and documents disclosed by one QIC to another QIC . . . shall be confidential, privileged and protected from direct or indirect means of discovery, subpoena or admission into evidence, to the same extent as provided by subdivision (c)(1)." *Id.* If the privilege was unwaivable as Appellants argue, there would be no need for this provision because disclosure of privileged information from one QIC to another would not result in waiver in any event. We will not render these provisions superfluous. *See Deberry*, 651 S.W.3d at 925.

Our opinion in *Federal Insurance Co. v. Arthur Anderson & Co.* is particularly instructive. 816 S.W.2d 328, 330–31 (Tenn. 1991). Like the QIC privilege, the accountant-client privilege is of "statutory origin" and silent on waiver. *Id.* at 329–30. Likening the accountant-client privilege to the attorney-client privilege, we held that the client was the holder of the privilege and may waive the privilege. *Id.* at 330–31 ("We are of the opinion that the relationship between an accountant and his employer is analogous to the relationship between an attorney and his client."). We see no reason to depart from this analysis.

In many respects, a healthcare organization's QIC privilege is similar to the corporate attorney-client privilege. The privilege belongs to the corporate client. *Boyd*, 88 S.W.3d at 213. But because a corporation cannot speak for itself, "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors," who must exercise the privilege consistent with their fiduciary duties and in the best interests of the corporation. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49 (1985). Just as a healthcare organization's management exercises the organization's attorney-client privilege and holds the power to waive it, so too does a healthcare organization's management exercise the organization's QIC privilege and holds the power to waive it. *See id.*

In this case, Memorial is a healthcare organization as defined under Tennessee Code Annotated section 68-11-272(b)(1). It is undisputed that Memorial "formed or retained" the QIC to evaluate the care rendered to Mr. Castillo. Tenn. Code Ann. § 68-11-272(b)(4). Therefore, Memorial holds the privilege and may waive it. *See id.* § 68-11-272(c)(1). Mr. Houston, as Chief Operating Officer, had the authority to waive the privilege on behalf of Memorial. *See Weintraub*, 471 U.S. at 348. And he did so.[7]

We next decide "whether permitting the waiver of this privilege is contrary to public policy or would violate the rights of third parties." *Powell*, 312 S.W.3d at 512–13; *Black*

---

[7] The PSQIA contemplates other scenarios in which different types of entities may form or retain a QIC. Tenn. Code Ann. § 68-11-272(b). Our analysis is limited to the facts in this case where the QIC was formed by an entity that actually treated the patient.

*Diamond*, 98 S.W.2d at 312. The proposition of an unwaivable privilege gives us great pause because it is contrary to established legal principles. Tennessee law "reflect[s] a broad policy favoring discovery of all relevant, non-privileged information." *Lee Med.*, 312 S.W.3d at 525 (citing *Harrison v. Greeneville Ready-Mix, Inc.*, 417 S.W.2d 48, 52 (Tenn. 1967); *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 915 (Tenn. Ct. App. 1990)); *see also* Tenn. R. Civ. P. 26.02; Tenn. R. Evid. 401. Privileges are "exceptions to the demand for every man's evidence" because they serve a greater public purpose than a single party's interests in any given case. *Lee Med.*, 312 S.W.3d at 526 (quoting *U.S. v. Nixon*, 418 U.S. 683, 710 (1974)). "[A]n asserted privilege must also 'serv[e] public ends.'" *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) (quoting *Upjohn v. U.S.*, 449 U.S. 383, 389 (1981)); *see, e.g.*, *id.* (stating that the psychotherapist privilege "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem"); *Bryan v. State*, 848 S.W.2d 72, 79 (Tenn. Ct. App. 1992) (defining the attorney-client relationship as "a mainstay of our system of justice"); *State v. Mitchell*, 137 S.W.3d 630, 639 (Tenn. Crim. App. 2003) (explaining that the marital communication privilege codified at Tennessee Code Annotated section 24-1-201 (2000) "promote[s] continued marital harmony" and fosters "the peace of families"). Despite these great interests, privileges "need not be broadly construed." *Powell*, 312 S.W.3d at 504 (citing *Lee Med.*, 312 S.W.3d at 525).

Upon closer examination, the concept of an unwaivable privilege becomes "[c]uriouser and curiouser[.]" Lewis Carroll, *Alice's Adventures in Wonderland* 15 (London, MacMillan & Co. 1898). Certainly, the lack of an express waiver provision does not imply that a statutory privilege cannot be waived. *See Powell*, 312 S.W.3d at 512 (stating that in the absence of an express waiver provision, a court should identify the privilege holder to determine whether the privilege can be waived). Many privileges established or recognized by statute do not contain express waiver provisions but still may be waived. The attorney client privilege is codified but may be waived by the client. *See* Tenn. Code Ann. § 23-3-105; *Buford*, 216 S.W.3d at 326. The accountant-client privilege is recognized by statute and may be waived by the client. *See* Tenn. Code Ann. § 62-1-116; *Arthur Anderson*, 816 S.W.2d at 330. Similarly, the psychologist-client privilege recognized in Tennessee Code Annotated section 63-11-213 is waivable. *See* Tenn. Code Ann. § 63-11-213; *Thompson*, 768 S.W.2d at 249; *Culbertson*, 455 S.W.3d at 150; *see also* Tenn. Code Ann. § 24-1-207 (codifying the psychiatrist-patient privilege).

Both the *Powell* and *Pinkard* courts recognized the potential for abuse if a privilege cannot be waived. *See Powell*, 312 S.W.3d at 513 & n.21 (stating that "declining to engraft a waiver provision onto [the statute] could enable some parties to engage in strategic behavior"); *Pinkard*, 545 S.W.3d at 457 ("The fact that the privilege cannot be waived is problematic . . . ."). An unwaivable privilege invites parties to use privileged information offensively as a sword while in the same breath claim privilege when that information is challenged. *See Arnold v. City of Chattanooga*, 19 S.W.3d 779, 788 (Tenn. Ct. App. 1999).

"[T]hey may not selectively disclose a protected document to prove a point and then invoke the work product doctrine to prevent their opponent from challenging their assertion." *Boyd*, 88 S.W.3d at 226 (citing *Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 (10th Cir. 1998); *Granite Partners v. Bear, Stearns & Co.*, 184 F.R.D. 49, 54 (S.D.N.Y. 1999)). This selective disclosure was exhibited in *Pinkard* where the healthcare organization was allowed to use privileged information in support of its summary judgment motion but later claimed the information was privileged, shielding anyone from probing the evidence's veracity. *Pinkard*, 545 S.W.3d at 448, 457. This type of gamesmanship does not "enable the parties and the courts to seek the truth so that disputes will be decided by facts rather than by legal maneuvering." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (citing *Harrison*, 417 S.W.2d at 52). We cannot condone this strategic behavior by finding the QIC privilege unwaivable when there are less drastic measures a healthcare organization might take to protect its interests.[8]

It has been asserted that the PSQIA privilege is unwaivable "because weakening this privilege could undermine the confidentiality that the privilege is intended to protect." *Pinkard*, 545 S.W.3d at 457–58 (internal quotation marks omitted) (quoting *Powell*, 312 S.W.3d at 512). But the same argument can be made in the context of any privilege. This Court has been unable to find any other nonwaivable privilege under Tennessee law despite the policy goals they serve. *See, e.g.*, *Buford*, 216 S.W.3d at 326; *Arthur Anderson*, 816 S.W.2d at 330; *Thompson*, 768 S.W.2d at 249; *Culbertson*, 455 S.W.3d at 150; *Boyd*, 88 S.W.3d at 213.

Appellants further argue that finding waiver will cause a chilling effect on QIC and other peer review proceedings that will eventually erode their overarching goals. We recognize the importance of open and honest input during QIC proceedings. The broad language and scope of the statute itself reflects its goal to improve the quality of patient care. *See* Tenn. Code Ann. § 68-11-272. But waiver does not subvert these goals. Any information relating to activities of a QIC remain cloaked with privilege. We trust the healthcare organization recognizes the broad privilege it possesses and is able to balance the interests at stake to make waiver decisions appropriately.

Similarly, Appellants argue that finding waiver will undermine the goals of the PSQIA because it allows one party to waive the privilege for anyone who contributed privileged information to QIC proceedings. We recognize that third parties, not employed by the healthcare organization that formed the QIC, may participate in the QIC. *See* Tenn. Code Ann. § 68-11-272(c)(1). But that risk does not undermine the goals of the PSQIA. The statute provides the QIC privilege for the benefit of the healthcare organization forming the QIC. It is the job of the healthcare organization, in its management of the QIC,

---

[8] For example, a healthcare organization could require a patient to sign an agreement protecting the privileged nature and confidentiality of any discussions regarding the adequacy of the patient's care.

- 17 -

to advise all participants that the privilege applies and that it may be waived by the healthcare organization.

In this case, the chief operating officer of a healthcare organization voluntarily disclosed privileged information to a patient's family. Once Memorial disclosed privileged and confidential information to Mrs. Castillo, that information is no longer privileged or confidential. The genie is out of the bottle. In any other context, the explicit and intentional disclosure of confidential information by the privilege holder would constitute waiver. *See, e.g.*, *Buford*, 216 S.W.3d at 326 ("If a client divulges the communications he seeks to protect, then he has waived the attorney-client privilege with respect to the reported communications . . . ."); *Arthur Anderson*, 816 S.W.2d at 328–29 (finding a client waived the accountant-client privilege by executing a sworn and notarized waiver); *Thompson*, 768 S.W.2d at 239 (finding defendant waived the psychologist-patient privilege after eliciting testimony from psychologist); *Culbertson*, 455 S.W.3d at 150 (stating if a client's "disclosure . . . of privileged information . . . is voluntary, it must necessarily constitute a waiver of the privilege with respect to the information actually disclosed[]" in the context of the psychologist-client privilege); *Boyd*, 88 S.W.3d at 213 ("[A] client may waive the privilege . . . by voluntarily divulging the communication to third parties."). We see no compelling reason to treat this privilege any differently.

Finally, we must determine the scope of the waiver. "The scope of the waiver by disclosure is defined by the 'fairness doctrine,' which aims to prevent the prejudice and distortion that may be caused by one party's selective disclosure of otherwise protected information." *Arnold*, 19 S.W.3d at 787 (quoting *Granite Partners*, 184 F.R.D. at 54). There is no indication that Memorial intentionally shared these statements with Mrs. Castillo as a particular strategy or offensive tactic in litigation. Rather, Memorial provided Mrs. Castillo an honest assessment of the quality of care provided to her husband during their meeting.

Considering the public policy interests and the context of the disclosure, we find waiver limited to what was discussed at the meeting. Therefore, Mr. Houston, Dr. Kodsi, and Ms. Stanley may be asked about that. However, this waiver does not extend to records or other sources on which the statements were based. For example, the reports of engaged experts, transcripts of witness interviews, and the identity of "[a]ny person who supplies information, testifies or makes statements as part of a QIC" remain privileged. Tenn. Code Ann. § 68-11-272(c)(1). A plaintiff still carries the burden of proof to put on evidence and expert testimony to prove a deviation from the standard of care. *See* Tenn. Code Ann. § 29-26-115 (2024). But a plaintiff should be able to discover, offer into evidence, and use for impeachment any information for which the privilege has been waived. *See* Tenn. R. Civ. P. 26.02; Tenn. R. Evid. 401, 607. However, to be clear, in this case, waiver only applies to the statements at the meeting, and nothing more.

**CONCLUSION**

For these reasons, we hold any statements made to Mrs. Castillo relating to the QIC process and/or conclusions were voluntarily disclosed, and the QIC privilege is therefore waived. This waiver is strictly limited to statements made during the meeting. We affirm the judgment of the Court of Appeals on separate grounds, and we remand this case to the trial court for further proceedings consistent with this opinion. The costs of this appeal are taxed to Appellants, for which execution may issue if necessary.

_____
DWIGHT E. TARWATER, JUSTICE